Mr. Justice WAYNE
 

 delivered the opinion of the court.
 

 This is the ease of a foreign vessel having'been libelled in a port of the United States when about to leave it;' her master having refused to pay for the damage said to have been sustained on a shipment of soap, made at Liverpool, to be carried to San Erancisco,. California, via Honolulu. The shipment' was made by Matthew Steele & Son. It was said in the bill of lading to be in good order and condition, and the undertaking was to deliver it so to Messrs. McKinlay, Garriock, & Co., or to their assigns.
 

 The consignees libelled the ship, alleging that, though they' were always willing to receive the shipment in good order, the master of the ship had not made it, and that they had refused to receive it, on account of the injury it had sustained from a want of proper care in loading, storing, landing, re-landing, and re-storing the soap, and owing to the careless, negligent, and improper manper of storing it under the deck of the ship, which was open and leaky, through which water passed, and damaged it to the amount of nine thousand five hundred dollars.
 

 The respondent meets the charges by a direct denial of them, averring if the soap had been in any way injured, it may have been from causes beyond his control by any care whatever, and should be attributed to causes or perils excepted to, as they were expressed in the bill of lading,
 
 viz: “
 
 all and every danger and accident of the seas and navigation of whatsoever nature.” The respondent also declares that his ship was, at the time of her sailing from Liverpool, in good, tight, and strong condition, well manned, and that her cargo was well dunnaged and stowed; but that, in the course of the passage-to Honolulu, she encountered heavy storms and gales, which strained and caused her to leak, and had compelled him to throw overboard a part of the cargo, for the preservation of the rest of it, and of the vessel; and that during the passage
 
 *346
 
 he had used
 
 every
 
 precaution to preserve the cargo that was within Ais power and that of his officers and crew.
 

 The libel and answer are directly at issue, and no answer can be made more responsively to the charges in a .bill than ■ this is.
 

 Accordingly, then, to the rules of pleading in admiralty, there is no necessity for doing so; nor are. we permitted to consider much of the testimony in this record. When litigants make their case in express allegations and by express denials of them, and then introduce testimony inapplicable to the issues they have made, it is not a part of the case, unless as it shall, inferentially bear upon other evidence properly in it, upon which the parties rely for the determination of their controversy. This case furnishes as apt an illustration of the rule just mentioned as can be given. The libellants put their case upon bad and careless stowage, &c., of the soap, and upon leaks in the deck of the ship, through which water passed and damaged it. The respondent denies both; but he goes on to state that his ship was tight and strong for the voyage when he left Liverpool, and both parties question the witnesses as to that fact; though the libellants had not charged that their goods had been injured from that cause, and had not put in issue at all the soundness and seaworthiness of the ship for the voyage she was about to make. This same point of pleading was before this court in the case of Lawrence
 
 v.
 
 Minturu, 17 Howard, 100, 110, 111, which was as learnedly argued, and as deliberately decided, as any other casé in admiralty has been in our time. This court then said: “We find the conduct of the master in making, the jettison to have been lawful; and the remaining inquiry is, whether the necessity for it is to be attributed to any fault on the part of the master or owners. The libel alleges the loss of the goods to have been through the mere carelessness (just as the libel in this case does) and misconduct of the master and mariners. We were at first inclined to the opinion that this allegation is not broad enough to put in issue what the libellants have at the hearing so much insisted upon, and what we think is the main question in this part of the case,
 
 the sufficiency of the ship to carry the cargo.
 
 It
 
 *347
 
 is no doubt tbe general rule, that the owner warrants his ship to be seaworthy for the voyage with the cargo contracted for. But a breach of this implied contract of the owner does not amount to negligence or want of skill of the master and mariners. There would be much difficulty, therefore, in maintaining, as a general proposition-, that an allegation of negligence of the master would let in the libellant to prove unseaworthiness of the vessel.” And in the next paragragh of that opinion, page 111, it will be seen that the rule of pleading in such cases was not enforced only upon the ground that the inquiry in that ease necessarily led to an examination whether the Jei
 
 iison was occasioned by the negligence of the master in overloading the ship.
 

 It was a nice distinction, but a true one, and it will have its influence, hereafter upon other cases having the same difficulties as that had. It has been adverted to, to warn the profession that the irregularities of pleading in admiralty, now too frequently occurring, have attracted our attention, and will be treated hereafter according to the rules and practice for pleadings', and proofs , in admiralty cases. Without doing so, the jurisdiction of admiralty may often be practically extended to controversies not belonging to it; and though.that may be inadvertently done, it will not be the less mischievous.
 

 With this rule in view, we will not examine much of the testimony in the case before us, though it was made much of the argument of the respective counsel representing the parties. It. excludes from the merits of the case all in the record relating to the storm in the Bay of Biscay, the leak which it caused, and the repair of it. Both parties have treated it, by their pleadings, as having in no way caused any damage to the soap; also, the storm which afterwards tried the seaworthiness of the ship to the utmost, when she was weathering Cape Horn, without any diminution of it, except s.o far as to inquire if it could have been that the seas which she then' shipped had damaged the soap, by the water passing through the seams of a deck imperfectly caulked. And we exclude, also, all that testimony made up-of the opinions of supposed experts in regard •to the- causes of the alteration in the - quality of the soap, ex-
 
 *348
 
 c.epting such of them as are sustained by facts which have the character of legal proof.
 

 By treating-the case in-this way, the controversy becomes exclusively one upon the alleged want of proper care in stowing, &c., the soap; and upon the charge made against the captain of the ship, that he had negligently allowed the seams of her deck to be in an open and leaking condition, by whicbwater had passed through them upon the soap.
 

 Our examination of the case has been made accordingly. It will be found to coincide with the admissions made in his argument by the learnéd counsel of the appellants. Two of his points were, that the injury or change in the quality of the soap jvas not owing to the effects of the gale occurring in .the Bay of Biscay, shortly after the ship left Liverpool, though it had produced a leak; next, that the heavy weather on the passage around Cape Horn did not produce any leak nor do any injury to the tightness of the ship, reserving, however, the charge that the water which she then shipped had passed through the leaks in her deck, and damaged the soap. Then,' after stating other propositions of obligation upon the ship, before she could be released from liability, and omissions of duty by the captain, and the proofs which were necessary to excuse them, which he contended had not been made, the case was put altogether upon bad stowage, and the leaks in the deck, as both had been alleged in the libel-. •
 

 First, as to the stowage. Two witnesses were examined, both of them professing to know how soap in boxes should be stowed for a long passage. They say that the stowage was improper, on account of the boxes having been placed or piled' in tiers in one part of the ship, and that they were stowed up to the main deck, and not chocked. One of them added, that regard should be had, in stowing, to the nature of the goods to be stowed; that soap should not be stowed in so solid a bulk as this was, but should have been distributed more over the ' ship. Waterman, another witness, who had never seen the ship, and of course knew nothing of the stowage, merely said that soap stowed twenty-five tiers deep, he should think .was badly stowed, and would be apt to be injured. Such is the
 
 *349
 
 whole of the testimony to prove bad stowage in this case, unless the opinions of other witnesses, expressed in the course of their examination, without any facts having been given by them to sustain their opinions, are taken as evidence. On the other hand, Nicholson, a man of more than thirty years’ experience as a nautical man, who visited the ship by the invitation of the port warden, to examine the soap, and who went into the hold for that purpose, says, in answer to the question, “ How was the cargo stowed ? Some of the boxes appeared to me to be re-stowed. I do not think the upper part was the original stowage. There were a great number of them in sight, and the cargo seemed to me to be very well stowed.” Noyes, who was called upon, as port warden, to survey the .ship, and two days afterwards to survey the cargo, says the soap was stowed in the after part of the ship, abaft the after hatch. It was all stowed together, and well stowed. Then Lowry, the stevedore who discharged the cargo of the ship, who saw her hatches opened, says the soap was well stowed.
 

 There are differences between the witnesses as to the stowage of the soap, but not contradictory assertions. As to credit, they stand alike. But there is a distinction in their declara^, tions, which, with us, is conclusive. The three first named speak of the manner of stowage, with reference to the effect which might be produced upon soap in boxes, stowed in a vessel in tiers, as these boxes were. Without a word of proof from themselves, or from any one else, or-from Mr. McCulloch, the chemist, who was called upon by the libellants to analyze the soap as it then was, to show the correctness of the apprehension or opinion of the witnesses, that, from the' composition of soap, it was liable to deterioration from being stowed in a mass in the hold of a vessel, and without any evidence that it was customary to stow soap, in boxes, differently. The other three witnesses speak of it as a nautical stowage, and, without any qualification, say that the soap was well stowed. Our . conclusion is, that the soap was not injured as a consequence from having been stowed as it was:
 

 • We proceed to the consideration of the second charge iff the libel. It is also an imputation of negligence upon the captain
 
 *350
 
 of the ship. It is, that the soap had'been injured by the deck having been allowed by him to remain in an open and leaking condition, whereby the water thrown or falling on it passed through upon the Soap beneath. It is indefinite as to the time when the leaking of the deck occurred, and uncertain as to the extent of it, but determinate enough to suggest the kind and quantity of testimony which is necessary to sustain such charge in the circumstances under which it has been made. The seaworthiness of the ship when she began the voyage not having been questioned in the libel, it must be taken that she was tight in her deck when she left Liverpool, and, if she became otherwise afterwards, that it must have occurred when she was at sea. There is no direct proof of it in the record, nor any cause, from tempest or storm, from which such an injury to the ship can be presumed. The burden of proof of such an allegation is upon the libellants, and the testimony to sustain it must be positive, or so violently presumptive as to be sufficient, by the rules of evidence, to supply the want of direct proof. Here there is no proof,, positive or presumptive, when, where, or from what cause, the leaking of the deck happened, or had been made. None that it had been, or might have been, occasioned by any straining of the ship- from the storms which she had encountered on her passage. Indeed, that is disclaimed. None that the oakum with which her decks were caulked had washed out of the seams of it, or that it had shrunk so as to leave, them open. And it was only suggested that they were opened by the heat of a long summer passage, and that they could have been recaulked after.
 

 The suggestion is in opposition to the proofs in the case. The ship sailed from Liverpool on the 26th of September, stanch and tight, and arrived at Valparaiso on-the 26th or the 27th of January following, just four months and a day from the -time of her sailing. The slight injuries which she suffered from the storm in the Bay of Biscay, and those encountered off Cape Horn, were repaired at Valparaiso. Thence she went to Honolulu, on the 28th of February, where she was twenty-four days, and caulked there her top-sides and water-ways, and she arrived-at San Francisco on the 7th June, having had fine
 
 *351
 
 weather all the way from Yalparaiso. .But it is proved that the soap could not have been injured from any leaks in her top-sides or water-ways, as the tiers of boxes - next .to them on either side were in a better condition than those which had been piled further off. These dates show that the ship .had- not • a, longer passage to Yalparaiso than is usual at the time of year when she was making it;-also, that it had been made through different latitudes, without encountering any great . continuous heats — certainly not such as could have had the effect to displace or shrink the caulking .of the deck into leaking, which is not denied to have been good and tight when the ship left Liverpool. It is -not probable that such, an exposure for so short a timé had forced her deck seams. Besides, it has not been shown by any reliable testimony that 'there had Been, at any time when the ship was on her way to Yalparaiso, any leaking from her deck, or any such afterwards, until her arrival in San Francisco, from which by any possibility, the soap could have been injured in the way and to the.extent it was. represented to have been., by some of the witnesses, who expressed the.opinion that there had been leaks in the deck of the ship, through. which salt water had leaked upon the soap. Indeed, it appears to us that all of the witnesses who •said so, did it rather -by way of inference from the caulking which another witness said had been done to the ship, and from the condition in which the soap was, than from an examv ination of the- ship. The witness (loodsell, more relied upon than any other witness to prove the leaks in- the deck; does not do so satisfactorily from the usual examination made by-shipwrights when they are. called upon to ascertain such a fact. He says: “I found the poop-deck, lately caulked, leaking on larboard side — six on starboard and one- seam about half on the starboard side, to main deck, I
 
 should think
 
 that the waterway seams, plank-shear seams, and one or two seams inside to main deck, or main deck,
 
 looked
 
 as if water had run down into the hold of the ship on both $ides.” He adds; he went into the hold of the ship and examined the under part of the deck. “I saw
 
 indications
 
 of the deck having leaked in the wake of the seams ! have been speaking of;
 
 they looked
 
 as if they had léaked
 
 *352
 
 all along, but more abaft than forward of the main deck.” This is very uncertain testimony; more of opinion than fact in it, even as to the caulking of which he speaks, and the result of all that he says concerning the seams below the deck, has more of inspection in it than of examination. The difference between them will readily be recognised from the positive language of two other witnesses, who say .they examined the seams of the deck below with their knives, and found them hard; one of them adding, it is impossible for a man to tell, after two or three weeks, whether a vessel is newly caulked, without trying her seams. Lowry, the stevedore who discharged the cargo, upon being asked if he had seen any traces' of salt watfer in the top of the boxes of the soap, or on the ceiling of the deck, answers that he had not, but- that he saw some places marked with chalk by some persons; that he tried them with his knife, and found them perfectly tight., Such is the testimony in the case, concerning the charge in the libel that the soap had been'damaged by leaks in the deck of the ship, which her captain had neglected to have caulked. In our opinion, it is altogether insufficient. Noyes, the port warden, who surveyed the ship, says he could find no leaks over or above where the soap was, that he could discover. lie also saw no traces of the deck having been recently caulked; Indeed, there is not a witness who has said that there were leaks in the deck. Several express the opinion that there were, from the discoloration of the boxes on them outside, and from that of the soap in them. Goodsell ventures further than any other witness, to cause such an impression; but his language is, “I should think,” and it.“looked” to him as if water had run down into the hold from the water-way seams, the plank-shear seams, and one or two seams inside, to deck or main deck. This conjectural way of speaking by a witness must yield to the positive declarations of Nicholson, Lowry, and Noyes.
 

 Having determined that the soap had not been injured by .bad stow age or leaking from the' deck, we will nów briefly state' ' to what causes its altered condition should bé attributed. We have concluded that its discoloration and dampness are to be found in the acknowledged tacts and proofs in the cause. The
 
 *353
 
 shipment was made at Liverpool on the 21st June, and was on board of the ship for a year, less fourteen days. After the shipment.and stowage-, the ship remained all of the summer at the dock in Liverpool.. She sailed on the 26th of September. From that time the ship’s hatches were closed until her arrival at Honolulu, in February. They were then opened for the purpose of discharging a part of the cargo which had been shipped for Honolulu. To do that, it was necessary to remove about three hundred boxes of the soap from their stowage, find to land- them. They were taken to the ship, re-stowed as they had been at first, and it does not appear by any evidence that it had been perceived at Honolulu by any one that this upper tier so removed had been injured, or that the boxes had then any appearance of water having leaked upon them. The ship' sailed from Honolulu and arrived at San. Francisco on' the 7th June. From the,day of her sailing, the 26th Septemher., she was at no timé within such a temperature of heat as would of itself have impaired the quality of the. soap. ' From England, in 10° north of the equator, the average temperature from the time of her sailing is 62°. Ten degrees north and south of the equator the average temperature for the months of September and October is 81°.
 

 The average temperature in November is about 41°, and that of Valparaiso-.is about 62°. These averages of temperature are taken from the most approved charts, and are decisive that the soap has not been injuréd by the temperatures through which the ship passed on her passage to Valparaiso. From that port the.ship came to Honolulu, a distance, not much short of six thousand miles, in the most favorable weather, without encountering heavy seas or head winds. She made that’distance in the usual time, forty-five or fifty days. Honolulu is in the latitude of 21° 19' north, longitude 157° 52' west. Nor are the temperatures such between Valparaiso and Honolulu as could have produced any change in the condition of the soap. From Honolulu the usual run to San Francisco is from fifteen to twenty days. As a general rule, the course of ships bound from the first to San Francisco would be to the northward of it, to be sure of good winds. In the absence, then, of other
 
 *354
 
 probable causes, to account for the change in the. quality of the soap, we must-resort to the proofs on the record, and from them we have concluded that the soap was injured by the temperature of the ship’s hold, or what is called the sweat of the ship, which no mode of ventilation, consistent with safe navi gation, has yet been thought sufficient to prevent. In this particular the ship was not inore liable from defective construction to this vapor than merchant vessels ordinarily are. Iler hatchways were good, the covers for them are not complained of, her hatch-bars and tarpaulings'wero sufficient, or they are - not denied'tohave been so; and it has not been suggested that they were not - all applied to cover the hatchways, and to protect the cargo from sea-water and rain. Nor is this sweat in ships any mystery to practical seamen. They term it to be vapor emitted from the mixed cargoes of ships by the heat of the hold of a ship, cast off sometimes only in fumes, at other times in steam, which shows itself in the latter case sometimes in, drops of water in the same way as rain is produced from vapor. Several of the witnesses — all of them were accustomed to the sea — say, that the sweat of this vessel caused the discoloration of this soap. Besides, it was a second-class article, differing originally in color from a first-rate article of the same kind. It is true that the chemist who analyzed it says that it had been made of good materials, and was well saponified, and ho says- that sweat is a mere
 
 evolution
 
 of water in a state of vapor; and that the boxes could not have been stained in that way, and that they were stained by some external means. But the proofs in the case show that there was no leakage in the deck by which water could have passed upon them; it must yield to the declarations of those witnesses' better acquainted ■than he is, from their professional acquaintance with the effects of the sweat of the soap upon these cases. We unhesitatingly ascribe the discoloration and dampness of the soap to the no eking of the ship, the nature of the compound of soap, and to .the long agitation of the soap in the boxes to which it had beén•subjectod in a boisterous passage.. The devaporation of water from- the vapor of the soap itself, with which it is cleansed in the making, heated by the sweat of the ship, would- be coii
 
 *355
 
 centratcd in the boxes, upon the so'ap, ancl would discolor it and make it damp, without any sensible diminution of its weight; and wc are confirmed in this conclusion by the witnesses who examined and weighed it, having testified that the boxes were of the same weight marked upon them when they were shipped at Liverpool. We feel bound to notice one point made in the argument of the cause by the counsel of the appellees, which is not an open question in this court. It was, that the appellants had no legal title to maintain their libel. In the ease of Houseman
 
 v.
 
 The Schooner “North Carolina,” (15 Pet., 49,) the same objection was made. This court.said: “An objection has been taken to the right of the appellee to sue in his own name, as' agent for the consignees, or to ■sue at all, as his power of attorney! from them bears date after the libel was filed; and it is also 'objected, that J. & C. Lawton, the con-' signees, had no right to institute proceedings to recover more than their proportion of the cárgo shipped on their own account. No authority has been, produced in support of these objections, and we consider it as well settled in admiralty proceedings, that the agent of absent owners may libel, either in his own • name, as agent, or in the name of his' principals, as he thinks best; that the power of attorney, subsequent to the libel, is a sufficient ratification, of -what he had done in their behalf, and that the consignees have such an interest in the'whole cargo; that they may proceed in this case, not only for what belonged to thenúand was shipped on their account, but for that portion ' also which was shipped by Porter, as his own, and consigned to'them.” ' The, same conclusion was repeated in 17 Howard, Lawrence and Miriturn, without' any qualification, as we understand that ca'se. In the first gs well as'in the second of these cases, the point was put on the interest which a consignee has in the consignment, as consignee, and not as owner of any part of it; that, from the'nature, of. the contract of a bill of lading, the consignee had a right to sue, in a,court of admiralty, for any breach of it. 'Whatever may be the uncertainty concerning the consignees right to sue in a court of law, from the conflicting decisions to bo found upon that right, there- are none that he may-sue in a court of admiralty In the United States.
 
 *356
 
 "When that case, however, occurs in this court, it will bé decided; and we now merely remark that, from our examination of most of the cases in the common-law reports, upon the facts of those eases, we have been brought to the conclusion that there is no rule of general application as to when the consignor or consignee should bring the suit at common law, but that it will always be important to consider in whom the right of property, and sometimes in whom the right of possession, was vested at the time of the breach of the contract or neglect of duty which is complained, of.
 

 We
 
 direct the affirmance of the decree from which this appeal was taken.
 

 Mr. Justice NELSON dissented.