## THE NAIL CITY.

*(District Court, W. D. Pennsylvania. 1884.)*

1. TOWAGE—LIABILITY FOR LOSS—NOTICE TO CONSIGNEE.

A transportation company undertook to tow a barge loaded with staves from Ravenswood, West Virginia, to Pittsburgh, and upon arrival there tied up the barge in the company's landing. For want of proper fastening the barge broke loose and the staves were lost. *Held*, that until reasonable notice was given the consignee of the staves of their arrival there was no delivery, and that the company was answerable for the loss.

2. CONSIGNEE—RIGHT TO SUE.

The consignee, although the mere agent of the non-resident owner, can sue in admiralty in his own name for the value of the staves.

In Admiralty.

*J. M. Stoner*, for libelant.

*Barton & Son*, for respondent.

ACHESON, J. This suit is for the value of about 67,000 staves, which, the libel charges, one Reuben W. Cooper, as the agent in that behalf of James F. Stone, on December 12, 1879, shipped by the steamer Nail City, at Ravenswood, in West Virginia, to be transported on board barge No. 48, hitched to and under the control and management of said steamer, to the port of Pittsburgh, there to be delivered to the libelant, for a certain stipulated freight, to be by him paid; which staves, it is alleged, were never so delivered, but were lost by the negligence of the master and the owner of said steamer, or of persons by them employed. The fact of such shipment is admitted, but the answer denies that the staves were shipped by Cooper as agent of Stone, and alleges, to the contrary, that the contract for the transportation of the staves was made with Cooper in his own behalf, and that the staves were deliverable to him, and, in fact, were delivered to and accepted by him at the respondent's landing at Pittsburgh; and it is further alleged that the libelant had actual notice from Cooper of the arrival of the staves, and was warned by him that owing to a rapid rise in the Monongahela river the barge was in peril, and should be removed from the respondent's landing; that the libelant was in fault in not so removing it, and hence was himself alone responsible for the loss of the staves; and the answer denies the alleged negligence. The testimony in the case is very voluminous, and in

many particulars conflicting. I have very carefully read and considered it, and, after much reflection, find the facts to be as hereinafter stated.

The Nail City and her barge No. 48 belonged to the Monitor Towboat & Lumber Company, (the party defending this suit,) a corporation engaged in transporting merchandise on the Ohio river. The company had a landing at Pittsburgh, and its custom there was, upon the arrival of its loaded barges at its landing, to give notice thereof to the consignees of the cargo. The staves here in question belonged to James F. Stone, who employed Reuben W. Cooper to procure transportation for them from Ravenswood (Stone's place of residence) to Pittsburgh, and to load the staves at the former place. This, in fact, was the extent of Cooper's agency in the premises. The libelant was Stone's broker at Pittsburgh to receive and sell his staves, and he was the consignee of this particular lot, and was to pay the freight thereon.

On November 20, 1879, Cooper sent the defendant company this telegram, viz.:

"PARKERSBURG, W. VA., Nov. 20, 1879.

"*Monitor Tow-boat and Lumber Co., Wheeling, W. Va.:* Can I have No. forty-eight to load staves for Pittsburgh? Answer.

"R. W. COOPER."

He received the following reply:

"WHEELING, W. VA., Nov. 20, 1879.

"You can load her with bucked staves at two dollars, and rough at two fifty per M.                          JOHN A. ARMSTRONG."

Mr. Armstrong was the president of said company. Subsequently the freight was fixed at $1.75 per thousand. Cooper took the barge from Parkersburg to Ravenswood, and there loaded upon it some 12,000 or 15,000 staves, and then turned the loading over to Stone himself, who completed it by November 27th.

On December 9, 1879, Stone visited Wheeling, and there had an interview with John A. Armstrong about the transportation of these staves. The two differ as to the details of their conversation; but the evidence, upon the whole, satisfactorily establishes that Armstrong was then informed by Stone that the staves belonged to him, and that they were to be delivered to the libelant at Pittsburgh. In the course of a day or two Armstrong sent the Nail City to Ravenswood for barge No. 48 and other barges, which the steamer took in tow on December 12th, and proceeded therewith up the river to Wheeling. There was no bill of lading for the staves. At Wheeling barge No. 48 was left while the Nail City made two trips with other barges to Pittsburgh and back. While barge No. 48 lay at Wheeling, John A. Armstrong visited Pittsburgh, and on December 17, 1879, called at the libelant's office, on Duquesne Way, above Eighth street, to collect a freight bill, and then and there had a conversation with the libelant in respect to said

barge. The witnesses who testify as to what occurred on that occasion are the libelant, his clerk, Joseph W. Craig, and Mr. Armstrong. They all agree that the libelant complained of the delay in bringing the barge forward, and that in reply to an inquiry the libelant informed Armstrong that Stone had directed him to pay the freight, which he would do. The libelant testifies:

"He [Armstrong] then told me that he had barge No. 48 at Wheeling, containing staves consigned to me. He asked me if I had been notified to pay him, or the company, the freight. I answered him, 'Yes;' that Mr. Stone had notified me to pay them $1.75 per thousand, which I told him I would do as soon as the staves were delivered to me and counted. He said, 'All right; pay it to Martin, the agent, at the wharf-boat.' "

With this Mr. Craig substantially coincides, adding that Armstrong expressly agreed that notice should be given the libelant of the arrival of the barge; but Mr. Armstrong testifies that he told the libelant he was doing the towing for Cooper, to whom, if in Pittsburgh on their arrival, the staves were to be delivered; but, if not there, then they were to be delivered to the libelant, and that when they arrived he would have Cooper or the libelant notified.

It is, however, shown by uncontradicted evidence that in the previous summer there was a transaction between all these parties precisely corresponding with what the libelant alleges was the arrangement in respect to the staves in question. In July or August, 1879, Cooper procured from the Monitor Tow-boat & Lumber Company a barge, which Stone loaded with staves, and which the company towed to Pittsburgh and delivered to the libelant, he paying the freight. Moreover, the libelant had been the consignee of many cargoes of staves (from other consignors) brought to Pittsburgh by said company, and its uniform custom had been to put the barges in its landing, and notify the libelant, who then sent a tow-boat for the barges, returning them when emptied. Why, then, should Mr. Armstrong have assumed the position which he claims to have taken in the interview of December 17th? Why should he have insisted upon a delivery of this lot of staves, in the first instance, to Cooper? The latter was not the owner of the staves, and was not to handle them at Pittsburgh. They were, in fact, consigned to the libelant, who was to pay the freight. All this was known to Armstrong. Furthermore, the libelant was a responsible resident dealer, while Cooper was a nonresident. In view of the undoubted facts just narrated, I am the more disposed to credit the testimony of the libelant and Craig as to what transpired at the interview of December 17th; and, upon the whole evidence, I find that John A. Armstrong did then agree, without any qualification, that notice of the arrival of barge No. 48 at Pittsburgh should be given the libelant. Besides, it is shown that about December 20, 1879, John A. Loper carried a message from the libelant to Andrew Martin, the resident agent of the Monitor Tow-boat & Lumber Company in charge of the company's office at its wharf-boat

and to John Cain, the pumper who took care of the boats in the company's landing, to notify the libelant when barge No. 48 arrived, which both said should be done; and later, on the same day, Craig, the libelant's clerk, being at the company's landing, made the like request of Martin and Cain, and they promised to send notice to the libelant immediately upon the arrival of the barge.

Upon the whole proofs, my conclusion upon this branch of the case is, and I find the fact to be, that the contract here was that the staves were to be delivered to the libelant, who was to pay the freight and agreed to do so.

The Nail City left Wheeling with barge No. 48 about December 20th, and proceeded up stream as far as Georgetown, where, becoming disabled by reason of the breakage of some of her machinery, she left her tow and returned to Wheeling. The defendant company then sent another of its boats, the Monitor, to take the tow of the Nail City to its destination. The Monitor took the tow in charge on December 23d, and proceeded as far as Sewickley, where, on account of rising water, she left barge No. 48. Having taken the rest of the tow to Pittsburgh, the Monitor returned for barge No. 48, and brought it forward, arriving at the defendant's Pittsburgh landing on the afternoon of December 24th,—the defendant's witnesses say between 3 and 4 o'clock. There is evidence tending to show that later on the same day (December 24th) there was a formal delivery of barge No. 48, as it lay at the defendant's wharf, by the captain of the Monitor to Reuben W. Cooper, and an acceptance thereof by the latter; but if this occurred it matters not. Cooper was not Stone's agent for that purpose; and it is not pretended he was the libelant's agent for any purpose. The libelant, as we have seen, was the known consignee of the staves, and to him alone could delivery be made under the transportation contract. Notice of the arrival of the barge was never given by the defendant company, or any of its employes, to the libelant. But Reuben W. Cooper testifies that late on the afternoon of December 24th he gave such notice to the libelant, and informed him the tow-boat H. M. Graham was ready to take the barge from the defendant's landing round into the Allegheny river, but the libelant replied that the Park Painter did his towing. It is certainly true that Cooper made a visit to the libelant's office on the afternoon of December 24th, and then informed him that he had just come from the lower part of Allegheny City, near "Glass-house," and had seen the Monitor passing up with the barge, or a barge he believed to be, No. 48. He testifies, however, that he afterwards went down to the defendant's landing, and, finding the barge there, returned to the libelant's office and gave him notice of its arrival, etc. The libelant testifies to the contrary, and is corroborated by Mr. Craig, the clerk in his office. They detail circumstances inconsistent with a second visit by Cooper to the libelant's office that afternoon, and both declare that no second visit was made by him.

Now, the libelant had sold the staves, and was under contract for their delivery to the purchaser; he had been on the lookout for them for a long time, and was complaining of the delay in their arrival, and if he knew from Cooper that the barge had actually arrived, it is unaccountable that he neglected to send a tow-boat for it. It is in evidence that he was in his office on the morning of December 25th for several hours; he says awaiting notice from the defendant company. Again, it appears that on January 16, 1880, while the matter was fresh in his recollection, Cooper, at the instance of Stone, made an *ex parte* affidavit before a notary public at Ravenswood relating to this whole transaction. That affidavit, in respect to the events of December 24th, is in entire harmony with the testimony of the libelant and Craig. Cooper therein mentions one visit that day to the libelant's office, at which he reported that "barge No. 48 was coming;" but he says nothing about a second visit that day. On the contrary, after stating that when he left Wheeling on December 16th barge No. 48 was there, he adds: "I never saw said barge again while she remained loaded with the staves, except on the twenty-fourth of December I thought I saw it pass Glass-house, Pa., in tow of the tow-boat Monitor;" and then he proceeds to mention his visit to the libelant's office, at which he gave that information.

The clear weight of the evidence upon the point now under examination, it seems to me, is with the libelant, and, accordingly, I find that Cooper did not give notice to the libelant on December 24th that barge No. 48 had arrived at Pittsburgh; and I further find that the libelant did not receive any such notice until between the hours of 1 and 2 o'clock P. M. of December 25th, when Cooper brought him word that the barge was at the defendant's landing in danger. About the time this notice reached the libelant, and before it was then possible for him to get the barge from the defendant's landing, it was swept away and the staves lost.

This brings me to a consideration of the circumstances connected with the loss of the staves, and to the question of the alleged negligence. The condition of things at the defendant's landing, on the morning of December 25th, was this: Outside of the stationary float there were six barges or flats lying side by side, lashed securely to the float, and on the extreme outside of those craft barge No. 48 lay, well out in the Monongahela river, and exposed to the force of the current. The river was high—the stage of water being from 12 to 15 feet—and was rising. The rise was exclusively out of the Monongahela, and hence the current was very strong. The water where the barge lay was rough by reason of the wind which prevailed, and, moreover, tow-boats were passing up and down the stream, and the barge was exposed to the swells they made. The expert witnesses say it needed splash-boards to prevent its swamping, which should have been supplied by those having it in charge. Moreover, barge No. 48 was secured by a single line only,—a head-line,—which was fastened to an

inside timber-head of the stave-barge, and was made fast to an outside timber-head of the outer one of the six craft above mentioned. In consequence of this method of tying barge No. 48 it swung about on the line, particularly as tow-boats passed, causing swells. Witnesses of experience say that the barge required a stern-line, and that it should have been lashed tight at both ends, square up with the outside boat to which it was tied. Two witnesses who were on passing tow-boats observed that the barge was in danger, and so expressed themselves at the time. John A. Loper, who was at the landing between 9 and 10 o'clock that morning, says he saw no one there taking care of the boats; and it is a significant fact that the defendant company did not examine either Martin or Cain, nor any witness, to explain how the loss in question occurred. It however appears from the libelant's proofs that early on the afternoon, probably about 2 o'clock, barge No. 48 broke loose and was quickly swept down the river. The staves were altogether lost.

I am entirely satisfied from the evidence, and find the fact to be, that the barge was improperly and insecurely fastened, and hence broke loose, and that the staves were thus lost by reason of the culpable and inexcusable negligence of the defendant company and its employes. There was a clear lack of reasonable care on their part, in view of the then existing circumstances. In the course of its dealings with the libelant and others the uniform custom of the defendant company was to take care of its loaded barges, after arrival at its landing, until notice of the arrival had been given the consignees of the cargoes. Undoubtedly this was its duty under the transportation contract here, and until reasonable notice was given the libelant there was no delivery. Ang. Carr. § 313. There is no doubt that the libelant has a right to maintain this suit for the non-delivery of the staves. *Lawrence* v. *Minturn*, 17 How. 100. The rule is well established that a consignee may sue in a court of admiralty either in his own name or in the name of his principal. *McKinlay* v. *Morrish*, 21 How. 343. Moreover, it is in proof that this suit was instituted with the approval and by the direction of the consignor.

It appears from the pleadings and proofs that the number of staves was 67,197. It is also satisfactorily proved that their value at the time of their loss was $23 per thousand, and they had been sold at that price. Hence the libelant is entitled to recover on the basis of that quantity and price, less the agreed freight, with interest from December 25, 1879. Let a decree be drawn in favor of the libelant in accordance with these views.