## THE BAYONNE.

## THE NELLIE.

### (District Court, E. D. Pennsylvania. February 3, 1904.)

### No. 45.

1. ADMIRALTY—SUIT FOR COLLISION—ISSUES AND PROOFS.

   In a libel for collision against two vessels, although separate answers are filed, and separate issues raised, all the evidence taken is properly before the court on final hearing, to be considered on all the issues to which it is relevant, no matter by what party it was put in.

2. COLLISION—TUG WITH LOG RAFT IN TOW—DUTY OF CARE.

   While the fact that a tug is burdened with a heavy and unwieldy tow, like a raft of logs, may relieve her from liability for a collision in some circumstances, it also imposes on her the duty of taking extraordinary care to keep her tow out of the way of other vessels.

3. SAME—STEAMSHIP AND LOG RAFT IN TOW—NAVIGATING IN DELAWARE RIVER.

   A tug which was proceeding up the Delaware river at night, with a log raft in tow, 400 feet long and 140 feet wide, was in fault for a collision between the tow and a meeting steamship which could have been seen when more than a mile away, where she had the raft in the main channel, which was only 250 feet wide, and to which the steamship was confined because of her draft, and made no change of course until the two vessels were within a half mile of each other. The steamship was also in fault where she kept her speed of 11 miles, and also kept her course in the center of the channel, without signaling until within half a mile of the tug, and when it was too late to avoid collision with the tow.

In Admiralty. Suit for collision.

H. N. Abercrombie, for owner of logs.
Henry R. Edmunds, for steamship Bayonne.
Horace L. Cheyney and John F. Lewis, for tug Nellie.

J. B. McPHERSON, District Judge. This is an action by the owner to recover damages for injury done to a raft of logs by a collision with the steamship Bayonne in the early morning of November 30, 1901. The raft was in tow of the tug Nellie, and both vessels are declared by the libel to have been in fault. It appears without controversy that about midnight the tug took the raft in tow at Delaware City, and proceeded up the Delaware river, on the way to Bordentown, N. J. In accordance with the custom of the river, the raft was being towed on the flood tide. When the tide is against them, these unwieldy tows are tied up at a convenient wharf until the current is again in their favor. This raft was construed of 12 units, called "lockings"; each locking being 23 feet wide and 200 feet long, and containing about 50 logs, fastened together with chains. Six lockings were arranged side by side, suitably fastened together; and to these the remaining six, similarly fastened, were attached. The raft, therefore, was 400 feet long, 140 feet wide, and contained 592 logs, fastened together in the way just described. The hawser that connected it with the tug was long enough to make the length of the tow about 600 feet. I do not know the dimensions of the tug, but she was not a large vessel—probably 40 or 50 feet long, and about 15 or 16 feet wide. The Bayonne is

a large tank steamer, employed in carrying oil across the Atlantic. She is of 2,154 tons net register, and on the morning in question was bound down the Delaware river with a full cargo, drawing nearly 27 feet of water. The collision took place near the foot of the Cherry. Island Channel, which runs perfectly straight for 2 miles, and for vessels of this draught is only 250 feet wide. Both the tug and the steamship had the proper lights set and burning, and there was no fog to obstruct the view. Lights could be seen for much more than a mile.

Before passing to the disputed facts, let me consider briefly a position taken by the proctor for the tug. He insists that the issues made by the libel and the two answers are so distinct that no testimony can be regarded in deciding the charges against the tug, except the testimony taken by the libelant and the tug, and that the testimony offered by the steamship must be wholly disregarded. In support of this position, Gardiner v. Bibbins, Fed. Cas. No. 5,222 is cited, but an examination of the report does not bear out the citation. In that case, Judge Betts merely decided that, where two were charged with a joint tort, and had put in separate answers, the answer of one respondent was not evidence for the other; but there is nothing in the decision to justify the conclusion that the court was not permitted to look at all the relevant evidence, no matter by which party it had been put in. In reason, as it seems to me, all the evidence taken in such an action is properly before the court on final hearing. In this class of cases, more than one controversy is usually being carried on at the same time. The injured tow charges both vessels with fault, and each of them endeavors to fasten the whole responsibility upon the other. The witnesses are heard and examined by counsel for the three separate interests, and I do not see why testimony taken under such safeguards should not be competent, no matter by whom it has been offered. Of course, it must also be relevant, and its relevancy is to be determined by an examination of the issues that are raised by the pleadings. As was said in McKinlay v. Morrish, 21 How. 343, 16 L. Ed. 100:

"The libel and answer are directly at issue, and no answer could be made more responsive to the charges in a bill than this is. According, then, to the rules of pleading in admiralty, there is no necessity for doing so, nor are we permitted to consider much of the testimony in this regard. When litigants make their case in express allegations, and by express denials of them, and then introduce testimony inapplicable to the issues they have made, it is not a part of the case, unless as it shall inferentially bear upon evidence properly in it, upon which the parties rely for determination of their controversy."

This case was cited with approval in United States et al. v. Huckabee, 16 Wall. 414, 21 L. Ed. 457, where Mr. Justice Clifford, on page 424, 16 Wall., 21 L. Ed. 457, used this language:

"Pleadings, in informations for seizures upon land, or for confiscation of property, as well as in causes of admiralty or maritime jurisdiction, or in actions at law or suits in equity, are governed by certain well-established rules of practice, which require that the allegations shall correspond with the facts as proved," etc.

McKinlay v. Morrish was followed by Judge Acheson, in the Western District of Pennsylvania, in Hays v. Packet Co., 33 Fed. 552, and by Judge Butler, in this district, in The Earnwell, 68 Fed. 228.

. But this is elementary, and need not be dwelt upon. Turning to the pleadings, therefore, to discover the issues, the third paragraph of the libel is found to be as follows:

. "That on the night of the day in question the moon was shining brightly, and lights and objects could be clearly and distinctly seen. The said tug had taken the raft in tow, as above set forth, and was proceeding with it up the western side of the Delaware river. The proper lights were set and brightly burning on the said raft. The said tug, with the raft, had proceeded about fifteen miles up the river, when about 4 o'clock in the morning the said steamship Bayonne come into sight, on her way down the river. When the said steamer Bayonne came within signaling distance, the tug blew two whistles, which were not responded to by the steamer until she was nearly upon the tug, and then she gave two whistles. That the said steamer approached the tug, bearing very slightly on the tug's starboard bow, and continued her course, coming at a high rate of speed. As the vessels came toward each other, there was little change, if any, in the course of the steamship Bayonne, and none whatever in that of the tug or raft. The said steamer came very rapidly toward the tug and raft, and when abreast of the Nellie, hardly 50 feet away, gave two sharp blasts of her whistle and sheered off to port, but too late to avoid a collision with the raft in tow of the Nellie, which she struck between the first and second lockings, and cut her way the entire length of the raft."

Based upon these averments, the charges of fault against the tug are:

"That those in charge of the tug Nellie were in fault in proceeding up the west side of the Delaware river, in not having a proper lookout, and not changing her course, and not giving timely signals to the steamer, and in other respects which will appear at the hearing of this case."

The libel was filed on August 18, 1902; but on October 2d, after the answer of the tug had been filed—which denied that the tug had been guilty of the faults specified in the foregoing quotation, and prayed that, "if the libelant intends to allege at the hearing that those in charge of the said tug were guilty in other respects than as set forth in said fifth article, the claimant prays that he shall be compelled to amend the libel at the present time, and to set forth fully all specifications of fault which he intends to make against those in charge of the said tug Nellie"—the libelant amended in these words:

"And in amending said libel he desires to allege other faults against the said tug Nellie than those charged in the fifth paragraph of the libel, namely, that the said tug was in fault in not having a proper lookout, in changing her course just before the collision, in attempting to cross the bow of the approaching steamer with a heavy tow, which she was barely able to control, and the mismanagement of those in charge of the tug in not keeping well over to the side of the channel, rendered specially necessary by the location, the tide, the character, size, and make-up of the tow, and the strength and capacity of the tug."

A supplemental answer was filed, denying the new charges, and averring that two of the faults charged against the tug were contradictory; the first being that she had not changed her course, while the second alleged that she had changed her course improperly. This averment seems to me to be mistaken. The libelant's language is not as clear as it might be, but I think the amendment must be taken as a substitution for the charges originally made. Otherwise the conflict would undoubtedly exist. It might have been wiser to bring the apparent conflict to the attention of the court before the testimony was taken, in order that the issue upon this point might be made certain. This was not done, however, and the steamship proceeded to take her testimony,

followed by the libelant, and last of all by the tug. The result of this looseness of pleading and procedure has been confusing, and has added much to the labor of the court. As will be observed, when the testimony is read, the pleadings are at odds with the facts; but, as the case has been heard on the merits, I shall dispose of it in the same way, without much regard to the pleadings, cautioning the bar, however, against regarding this disposition of the matter as a precedent.

Returning to the facts of the accident, I may say at once that in my opinion the tug was in fault for keeping her course too long. The captain testified that as he approached the mouth of Christiana creek, about 4 o'clock in the morning, coming up on the westerly side of the river, and intending to tie up at Edgemoor because the tide was about to turn, he saw the lights of a schooner lying at anchor about 100 feet below the mouth of the creek, and close to the western edge of the channel. In order to avoid collision with the schooner, he took the tow out into the channel, and, having passed the schooner to the eastward, directed his course again to the westward, in order to reach the wharf, which was about a mile and a half above the mouth of the creek. As he changed his course from the middle of the channel to the westward, he saw the lights of the Bayonne about two miles away. He declares that he first saw the red light of the steamship, then the green, then the red again, and finally the green, which he continued to see until the collision took place. He himself was showing his green light to the steamship all the time. Thereupon he straightened up in order to get the tow in proper position behind him, and then proceeded up the river. Soon afterwards he blew two blasts to the steamship, to which she did not reply as soon as is customary. After an interval, however, she did answer the signal with two blasts; and, being by this time not more than a quarter of a mile away, she followed it up with another signal of two blasts, which the captain of the tug accepted by two blasts upon his own whistle. Both vessels then changed their course to port, but by this time the collision was inevitable; and, although the steamship succeeded in escaping the tug by 50 or 60 feet, she could not escape the raft, but struck it upon the starboard corner, carrying away some of the lockings, and ultimately causing the loss of 65 logs, that could not be recaptured. As a whole, this cannot be true. The "capers" of the steamship, as one of the witnesses described the rapid changes of course that showed her red and her green lights alternately, are incredible. The channel is perfectly straight at this point, and so narrow for a deep-draught vessel that she must be kept on the ranges. No reason can be imagined for several changes of course, and I am confident that they were not made. There are other discrepancies and contradictions in the captain's testimony that prevent me from giving it very much weight. It is true that the tug was the burdened vessel, and being, therefore, unable to move rapidly, would be relieved of liability in some situations; but her very incumbered condition laid a duty upon her to take proper care to keep out of the way of other vessels whom she might fairly expect to meet at close quarters. The Alabama (D. C.) 114 Fed. 218. She was towing a heavy raft of logs, 140 feet wide and 400 feet long, nearly, if not quite, in the middle of a narrow channel; and, in a river like the

Delaware, that is much frequented by other craft, this was a serious menace to their safety, especially after dark. The lights on the raft were so placed that they might not be easily seen, being only 5 feet above the water; and, of course, if an approaching vessel supposed that she had only a tug with a vessel in tow to look out for, instead of an obstacle 140 feet wide, she would naturally believe herself free to pass at a less distance than if she knew the truth. I think, therefore, that the tug should have altered her course to the westward as soon as she made out the lights of the steamship, for I think it is certain that, while it may have been the Bayonne's green light that was seen, she was very little to starboard of the tug, and the part of prudence for the light-draught vessel, with a formidable obstruction in tow, and having the whole river open to her, and not merely a narrow channel, was to increase the distance between herself and the approaching danger. Undoubtedly, if she had increased it, even by a few feet, the collision would have been avoided, and her obstinacy in holding her course too long was, therefore, in my opinion, a prominent and contributing cause of the injury. I do not think that the raft was in fault. Nothing is charged against it, except the failure to keep the lights burning brightly, and the evidence on this subject is too slight to be accepted.

It remains to consider the liability of the Bayonne, against whom it is charged that she was "running at too high a rate of speed in the said Delaware river, in not taking proper steps to keep out of the way of the said raft, in not having a proper lookout, and in other respects which will appear at the hearing of this case." Her account of the collision is, I think, equally incredible. It is as follows:

"At about 1:15 a. m. of said 30th day of November the Bayonne left her anchorage at League Island in charge of a duly licensed pilot, who, together with an officer and the master, were on the bridge, and a competent man forward on the lookout. About 4 o'clock a. m., when the steamer was in the Cherry Island Cut Channel, the lights of the tug Nellie were discovered coming up. The lights seen were the masthead and red side light of the tug, and a considerable distance away and about two points off the port bow of the steamer. The channel or cut at this point is about 2 miles long, and for vessels of the draft of the steamship Bayonne (26 feet 8 inches) about 250 feet wide, and perfectly straight. The steamship's draft compelled her to keep as nearly as possible in midchannel. She kept up her speed, which was 10½ or 11 miles. The tug and the steamship were on courses that prevented any thought of a collision; but, when they had approached within a very short distance of each other, the tug shut out her red light, and showed her green, and gave two whistles, indicating that she was going to the westward, and thus crossing the course of the Bayonne. The Bayonne at once replied with two whistles, and starboarded her wheel, throwing her head to the eastward about two points, when, being so near the bottom, she refused to go any further; and the raft in tow of the Nellie, tailing up with the flood tide, and unable to follow the tug, was struck on the starboard corner of the first section by the Bayonne, doing the damage complained of. The Nellie, it appears, was making for Edgemoor, on the western shore, where she expected to lie for a flood tide."

To suppose that the tug, with so heavy a tow, would have deliberately tried to cross the bows of the steamship when they were only 300 feet away, is too severe a strain upon my imagination. Haney v. Packet Co., 23 How. 291, 16 L. Ed. 562; The Maggie S. Hart (D. C.) 38 Fed. 765; The Hercules (C. C.) 17 Fed. 606; The Peters (D. C.)

42 Fed. 269. What happened, as it seems to me, must have been simply this: Both vessels were in the middle of the channel. The Bayonne certainly was, and there the collision took place. They saw each other nearly head on in time to get out of each other's way, but neither was inclined to move, in the hope that the other would be obliging enough to yield the road. They both held on, therefore, until a dangerous situation was created, and, while their efforts to escape were nearly successful, they did not succeed altogether. The steamship was in fault for holding her course too long, under the circumstances, for not signaling sooner, and for not slowing down until the danger to be encountered became perfectly clear.

A decree may be entered in accordance with this opinion.