## O'BRIEN BROS., v. MORAN TOWING CORPORATION et al.

## BEARD'S ERIE BASIN, Inc., v. THE EARLY LIGHT et al.

## THE EARLY LIGHT.

Nos. 16899, 16914.

District Court, E. D. New York.

March 26, 1946.

Hagen & Eidenbach and Nelson J. Johnson, all of New York City, for Beard's Erie Basin, Inc.

Foley & Martin and Christopher Heckman, all of New York City, for O'Brien Brothers, Inc.

Burlingham, Veeder, Clark & Hupper and Frederic Conger, all of New York City, for Moran Towing Corporation.

Macklin, Brown, Lenahan & Speer, and Leo F. Hanan, all of New York City, for Pittston Stevedoring Corporation.

KENNEDY, District Judge.

These suits arise out of the capsizing of the deck scow Early Light on August 10, 1943, at the Elevator Dock at Erie Basin. On August 9 and 10, 1943, employees of the impleaded respondent Pittston Stevedoring Corporation [1] were then discharging ballast from S. S. Oremar into Early Light. The scow was under charter to Moran Towing Corporation at the time, and had been since July 10, 1943. One suit is by the owners of the scow against Moran Towing Corporation [2] as charterer. In that suit, Moran impleaded the stevedore, Pittston Stevedoring Corporation. The other suit is by Beard's Erie Basin, Inc., the owner of the pier and slip, to recover the cost of removing from the slip the ballast which Early Light discharged when she careened. In this suit the scow and her owners impleaded Moran, which in turn impleaded Pittston.

The issues in both suits are identical:

(1) Was the scow improperly loaded, and was this improper loading a proximate cause of the disaster?

(2) Was the disaster brought about by the unseaworthiness of the scow, and if so, when with respect to the commencement of the charter, did she become unseaworthy?

There is no proof at all that Early Light was improperly loaded; on the con-

---

[1] Called Pittston hereafter.    [2] Called Moran hereafter.

trary it affirmatively appears from the evidence of witnesses who would normally be neutral, or even hostile to the stevedore, that after loading was completed Early Light was in good trim. And the load placed upon her was well within her capacity. It is, therefore, clear that Pittston should be exonerated in both suits. This leaves for determination only the question whether the loss should fall primarily upon the scow and her owners on the one hand, or on Moran, the charterer, on the other, and this turns on whether Early Light was seaworthy when she went on charter.

Early Light is 112.5 feet long; her beam is 33 feet, and her hold 8.3 feet deep. On July 10, 1943, she was delivered to Moran under the usual harbor charter. She had been in Moran's service before (February 29, 1943, to June 21, 1943). Under the charter here involved she had, prior to August 10, 1943, safely carried two cargoes of sand ballast and slag ballast. The first trip was from Pier 36, North River to Port Newark on July 10th, and the second trip from Pier 32, Manhattan to 21st Street, East River on July 23, 1943, terminating on August 1, 1943. During each of these trips Early Light carried about 500 tons of ballast. The capacity of the scow is between 643 tons and 693 tons.

On the morning of August 9, 1943, Early Light had been placed alongside S. S. Oremar at the Elevator Dock, Erie Basin. Early Light's port side was against the port side aft of the steamship, the plan being that the scow was to receive the ballast that was discharged from the steamer's after hatch. There were no unusual conditions of wind, tide or weather at any time between August 9, 1943, and the night of August 10, 1943, when Early Light careened.

Loading was carried on between 9:30 a.m. and 12 noon, and between 1 p.m. and 5:30 p.m. on August 9, 1943. On the evening of that day there were approximately 250 tons of cargo on the scow. She was then on an even keel and the cargo was in proper trim. At 9 a.m. on August 10, 1943, loading was resumed and continued until 6:30 p.m. on that day, at which time the scow had on board about 520 tons.

This was at least 100 tons less than her carrying capacity. The hand on another scow, a watchman on Oremar, and the night mate of that ship all testified that until 9:30 p.m. Early Light was in good trim, on an even keel, with a slight drag aft. At 9:30 p.m. a watchman on Oremar noticed that Early Light was listing away from the ship. The night mate of Oremar thereupon aroused the scowman on Early Light by throwing stones at the cabin. The scowman, upon being told of the danger and the necessity that something be done, left the scene and never did return. He did not testify at the trial. His employment with O'Brien had begun on August 4, 1943.

A survey made on Early Light after the disaster showed that she had developed a twist. There were no breaks in her hull. All the physical damage found could be explained by the fact that the scow had capsized, and there was nothing to suggest any other reasons for the sinking. This inevitably leads to a finding that she was certainly unseaworthy on August 10, 1943.

The scow's owners assert that the condition of the pleadings between them and Moran does not permit a finding that the disaster was brought about by the unseaworthiness of the Early Light. Moran, in its answer in the scow's suit, states very plainly that the sinking was caused by improper loading, and makes no suggestion that the scow's unseaworthiness was an alternative cause. Relying upon cases like Second Pool Coal Co. v. People's Coal Co., 3 Cir., 1911, 188 F. 892, and McKinlay v. Morrish, 1859, 21 How. 343, 62 U.S. 343, 16 L.Ed. 100, the owners of the scow say that in the admiralty no decree is proper unless it is based not only upon the proof but also upon the pleadings, and since Moran has not charged unseaworthiness in its answer then, in the event improper loading was not proved, the loss must fall upon the charterer.

It is perfectly clear to me that a decree in the admiralty must follow both the proofs and the pleadings. However, in this case the scow's owners assert in their libel that Early Light was seaworthy when she went on charter. This was

surely one element of the scow's case; and she goes rather far when she insists that with the pleadings in their present condition the respondent charterer must nevertheless expressly assign unseaworthiness as a cause of the disaster. The real burden of proof is not affected by the absence of such an allegation in the answer. Nobody could have been surprised[3], and the record is as complete as the parties cared to make it, so far as the issue of seaworthiness is concerned. It is my belief, therefore, that even though the charterer's answer contains no affirmative allegation of unseaworthiness, the issue is still here, and in the scow owners' suit the burden of proof on that issue is still on them.[4]

■ All of the probabilities lead to the conclusion, as I have said, that on August 10, 1943, when she went down, Early Light was unseaworthy. Was she unseaworthy on July 10, 1943, or did she become so in the hands of the charterers? The answer to this question depends upon where the probabilities lie: is it more likely (1) that a 26-year old wooden scow which made her last trip to the dry dock seven years prior to the overturning on August 10, 1943, was unseaworthy on July 10, 1943, or (2) that she was tight and staunch on the date last mentioned, and suddenly became unseaworthy without intervening cause, during the one month between the time she went on charter and the time she sank?

This question answers itself. The obvious answer is that Early Light was unseaworthy on July 10, 1943. It is true that a scowman who was on board on July 10, 1943, testified that she was "in good condition." It is also true that during the month prior to the careening Early Light carried two cargoes safely. But the testimony of the scowman was not very persuasive. Judge Thatcher rejected much stronger evidence of inspection at the time of charter in The Scottie, 1929 A.M.C. 1726, on the basis that testimony by the owner that he strolled through the scow's hold with a lighted lantern contributes very little to the proof of apparent seaworthiness. (This was on the issue of the right to limit liability.) And, of course, the fact that she carried cargo safely prior to the disaster is not itself sufficient proof of seaworthiness. The Irving, D.C., 16 F.Supp. 22, affirmed without opinion, 2 Cir., 91 F.2d 1011. Moreover, the scowman who had charge of Early Light between August 4, 1933, and August 10, 1943, took French

---

[3] See s.m. 20, 21, 382. The suggestion that the scow did not have the burden first arises at the very end of the case (s.m. 383).

[4] I have made no reference to the fact that in the suit by the pier owners the libel alleges unseaworthiness as a form of negligence (Art. IV). This charge was made against the scow, her owners, and her charterers. The scow's owners in their answer (Art. V) denied knowledge or information sufficient to form a belief about this, but seeking to implead Moran, alleged in their petition (Art. V) that Early Light was in seaworthy condition when delivered. Moran in its answer to this petition (Art. V) admitted return of the scow to her owners in damaged condition, but denied knowledge or information sufficient to form a belief as to the other allegations of the article of the petition. In the petition to implead Pittston, Moran alleged (Art. V) that the damage to pier and slip was caused either by the negligence of Pittston or by the negligence and fault of the scow's owners.

Overlooking everything else, it seems to me that in Beard's suit, in support of a charge of negligence (which so far as the scow was concerned included a charge of unseaworthiness) the pier owners had the benefit of a rational inference (arising from a sinking in calm water) which opened up the whole question of seaworthiness. This, in the circumstances of the case, called upon the trier of the facts not only to resolve the larger issue, but to make a determination when, with respect to the commencement of the charter, Early Light became unseaworthy, if she did.

Even Baron Parke would have some difficulty to justify rules of pleading which on the basis of a finding of unseaworthiness prior to July 10, 1943, permit a recovery by the pier owners against the guilty scow, and in a companion suit tried at the same time allow the guilty scow to recover against the blameless charterer, because the latter failed to counter a claim of seaworthiness with a claim of unseaworthiness.

I have been talking of burden of proof. The element of surprise because of obscurity in the pleadings is another matter. I emphasize that I would not willingly see a suitor surprised. Here I don't believe that happened.

leave while his scow was sinking, and his testimony was not available at the trial. Even if I were to overlook any questions about burden of proof, I would still be compelled to find that if Early Light was unseaworthy on August 10, 1943, she was unseaworthy on July 10, 1943, when she went on charter.

In the suit of O'Brien Brothers, Inc., v. Moran Towing Corporation, respondent, and Pittston Stevedoring Corporation, respondent-impleaded, there should be a decree dismissing the libel. In the suit of Beard's Erie Basin, Inc., v. O'Brien Brothers, Inc., and Early Light, respondents, and Moran Towing Corporation and Pittston Stevedoring Corporation, respondents-impleaded, there should be a decree in favor of libellant against Early Light in rem and her owners in personam. In that suit, Pittston Stevedoring Corporation is, of course, entitled to a dismissal of the libel; the same result should follow as far as Moran Towing Corporation is concerned, since the libel is based upon a claim of negligence, and there is nothing in the record or the relations of the parties to charge Moran Towing Corporation with any secondary liability.