## HURLBUT v. TURNURE.

(District Court, S. D. New York. October 29. 1896.)

GENERAL AND PARTICULAR AVERAGE—APPORTIONMENT—DEFICIENT COAL SUPPLY—HURRICANE—PORT OF DISTRESS—BILL OF LADING—"LIBERTY TO CALL."

The steamship D. left Cuba upon a voyage for New York in October, with a half day's less supply of coal than the customary supply, which was for at least 10 days; she met a hurricane on the voyage, and was obliged to put into Newport News for coal, after 12 days, during which time she had been obliged to consume ship's material to the amount of about $900 in value, and sugar amounting, with damage to other sugar, to $3,293. A clause in the bill of lading authorized the vessel "to call at any port or ports for whatever purpose": *Held* (1) that the bill of lading clause did not release the vessel from the duty of taking in the customary supply of coal for the whole voyage to New York; nor from the consequences of her failure to do so; (2) that the ship must therefore bear as particular average the damage caused by her failure to take the customary supply, including the expense of putting into Newport News, and the loss of ship's material and sugar during the time that the coal she ought to have taken would have lasted, but not for any longer period; (3) that the residue of the loss of ship's material and sugar, which in this case amounted to four-fifths of the whole, was owing to the hurricane alone, and being in no way consequent on the short supply, was a general average charge, for which the defendant as one of the cargo owners should bear his proportion.

This was a libel by William W. Hurlbut, against Lawrence Turnure on a general average bond.

Convers & Kirlin, for libellant.

Carter & Ledyard, E. L. Baylies, and W. F. Taylor, for respondent.

BROWN, District Judge. The above libel was filed upon a general average bond to recover the defendant's share of a general average

assessment made upon the steamship Dunedin and her cargo, for ship's materials and cargo consumed as fuel, and also for port of refuge expenses in putting in to Newport News for additional coal, upon a voyage from Cienfuegos, Cuba, to New York, in October, 1891, under the following circumstances:

The steamer left Cuba on the 3d of October with a cargo of merchandise, including sugar of the respondent and others. An ordinary passage with her cargo, and in the probable condition of her bottom, (not newly scraped) would have been eight days, or a few hours over, excluding any specially unfavorable weather. Her consumption of coal was 12 tons per day; and the evidence does not warrant my finding that on leaving Cienfuegos she had over 115 tons, a supply for say 9½ days. She was 12 days, however, in reaching Newport News, still one day's sail from New York. On the 4th of October, the second day out, on rounding St. Antonio, she met head winds and seas, and on the 9th and 10th a northeast gale. This, on the 11th, became a hurricane, which continued through the 12th and 13th, and carried her back on her course, so that she was unable to reach Newport News until the 15th of October. On the morning of the 11th, with only 18 tons of coal left, the engineer began to use ashes and ship's material along with the coal; and on the 12th, with but 12 tons of coal remaining, the use of sugar as fuel along with coal began. During the last half day, on the 15th, before reaching Newport News, only sugar fuel, according to the Captain's testimony, was used.

If 115 tons of coal was a reasonable supply for the voyage to New York, then the consumption of the ship's material and cargo that became necessary from the prolongation of the voyage through extraordinarily long-continued heavy weather, and the putting into Newport News for additional coal, were general average expenses, and the charges as assessed should be sustained. The defendant contends that 115 tons of coal on leaving Cienfuegos was not a reasonable supply for a voyage to New York at that season; that the consumption of ship's material and cargo were the result of the ship's fault in not taking a reasonably sufficient supply, and that the general average assessment should, therefore, be disallowed.

The weight of testimony is that for the ordinary contingencies of the voyage, there should have been at least 10 days' supply of coal or upwards; whereas the steamer took only 9½ days' supply. I cannot sustain the contention, however, that a mere deficiency of five or ten tons below the customary supply makes the ship an insurer against all subsequent events, or against damages not arising from the short supply, so as to exempt the cargo from a general average charge not arising from this deficiency. No authorities to that effect have been cited. The analogies are to the contrary. An insurance policy, indeed, does not attach if the vessel is unseaworthy at the commencement of the voyage insured; because seaworthiness is a part of the contract, and a condition precedent. But seaworthiness is not a condition precedent of the obligation of the shipper to pay freight. Though the shipper may for

unseaworthiness refuse to load, yet if he ships his goods, and the voyage is performed, he must pay the stipulated freight, less any damages arising from the breach of the implied covenant of seaworthiness. 1 Pars. Shipp. & Adm. 285, 320–322, and note. A charge on cargo for a general average expense, is of the same nature, in this regard, as freight; and so far as that charge arises from causes clearly independent of the ship's defects, the general average should be upheld. The proper legal consequence of the ship's default, therefore, is that she shall stand chargeable with the full performance of her duty to make good the customary supply of coal, and bear all the proximate consequences of her neglect to do so at the start. This involves two obligations on her part in this case; (1) to bear the charges and expenses of putting in to Newport News to get additional coal; (2) to bear as particular average so much of the consumption of material and cargo, and of the damage to cargo, as arose during the period for which the supply she ought to have taken would have lasted. If these charges are put upon her, she is made to bear the whole consequences of her neglect.

1. Not having fulfilled her duty to take the usual supply, she must be deemed to have voluntarily taken the risk of putting into some port of call in order to make that supply good, should the voyage be so prolonged as to require it. This became by implication a part of her original provision for the performance of her duty to procure coal necessary for the voyage, and hence was one of the ship's liabilities from the start, of which she took the chances, at her own charge. It is true that even the full customary amount would not have enabled her to reach Newport News, and she would have been compelled to put in there just as she did, even had she taken the full supply of 120 tons; and in that case the cost of putting in would have been a general average item, because having performed her duty at the start, she did not assume any further risk in that regard. But by her short supply at the start, having voluntarily, in effect, agreed to go into Newport News at her own expense for more coal, if it should be needed, she cannot be allowed to escape that implied agreement, and throw the cost of that item into general average, i. e., in part upon the cargo, merely because the necessity for more coal, as it turned out, was greater, and arose earlier, than was to be anticipated. Had the coal which she took on board been just sufficient to enable her to reach Newport News, she must have put in there for more coal, and she could not have made any general average charge for the item of putting in there; because it was by her own neglect that she failed to take the customary amount, and because, in effect, she thereby agreed to stand the charge of putting in there, if necessary.

2. The ship must further make good the consumption of material and cargo for fuel, and the damage to cargo incident thereto, for such period as the deficit, if taken on board, would have supplied; that is to say, for one half day out of the $2\frac{1}{2}$ days, which was the whole short supply necessary to reach Newport News; that is one fifth of the whole item of loss.

The adjustment of general average given in evidence shows that the value of the sugar consumed and the damage to other bags incident to getting fuel out of the hold during the hurricane, amount to $3,293; while the value of ship's material, oil, &c., consumed for fuel, exclusive of the expenses of putting into Newport News, amounts to about $900. One-fifth of these two items amounts to $839.60, which should therefore be charged against the ship alone, representing as nearly as can be ascertained the damages resulting from her failure to take in ten days' supply. The residue, equivalent to two days' consumption of fuel, with the incidental damage to other bags, remains a proper subject of general average, to which are to be added such incidental expenses and items as are embraced in the general average account, unless some exception thereto be taken, excluding however, the expenses of putting into Newport News, as above stated.

3. The bill of lading contains a clause authorizing the vessel to "call at any port or ports for whatever purpose." I do not think this clause has any material bearing upon the present question. It has been repeatedly construed and adjudged not to authorize any departure to ports away from the ordinary course of the voyage, or for any purpose disconnected with the voyage. In other words, it is to receive a reasonable construction; a construction not inconsistent with the well settled right of the shipper to have the specified voyage pursued in the usual manner, without unnecessary delays, or the increased risks incident to such delays. It authorizes calls for reasonable cause, or for necessity arising upon the voyage. But it is not reasonable, and the clause cannot be deemed intended, to release the ship from the performance of any of her ordinary duties in preparing for the voyage, or to authorize the ship to sail voluntarily from the port of departure with a short supply of coal, and thus deliberately to create a necessity for calling at intermediate ports not mentioned in the bill of lading, and contrary to the customary course of the voyage.

The clause in question is not equivalent to a specific provision for liberty to coal at Newport News, because in that case the shipper would have specific notice of the intent to stop there and to depart from the customary voyage. That would be a voyage of separate stages with full notice of that fact to the shipper. This was a defined voyage from Cienfuegos to New York, which the shipper had a right to expect would be pursued in the usual manner, and without unusual stops.

By the stipulation between the parties, it appears that Newport News is a usual coaling place for steamers going up and down the coast that find themselves in need of additional fuel; but that there is no custom authorizing steamers plying between Cuba and New York to coal only for an intermediate port. On long voyages, coaling at ports of call is necessary and customary; and upon such voyages it is enough for the ship to take a sufficient supply from one usual coaling station to another; and if the usual and ordinary supply between the customary stations is found insufficient, through extraordinary weather, the loss by the necessary

consumption of material in order to reach the next station, is evidently a proper subject of general average. "

In the absence of any custom authorizing the ship to coal for Newport News only, it was her duty, as I must hold, notwithstanding this clause of the bill of lading, to take a reasonably sufficient supply for New York, the direct destined port.

In determining what is a reasonable supply of coal for such a voyage, no doubt the facilities for obtaining coal at Port Royal or Newport News, in case of very extraordinary weather, may rightfully be taken into account; and it is to be presumed that the witnesses on both sides who have testified as to what was a reasonable amount, considered these facilities in cases of special emergency; otherwise, it is clear that an excess of only two days supply beyond the amount required for an ordinary voyage, would not be a reasonably sufficient amount to meet the chances of a hurricane during the hurricane season.

The ship must, therefore, bear the proper consequences of her omission to coal as customary, as above stated; and the general average is sustained for the residue only. If the parties are not willing to abide by the adjustment made by Johnson & Higgins, with the above correction, a reference may be taken to a Commissioner to make up an adjustment.

Decree against the respondent for his share of the general average, corrected as above.