HURLBUT et al. v. TURNURE et al.

(Circuit Court of Appeals, Second Circuit. May 26, 1897.)

1. GENERAL AVERAGE—SHORT COAL SUPPLY—RESPONSIBILITY OF SHIP.
A mere deficiency of five or even ten tons, below the customary and probably adequate supply of coal for the contemplated voyage, does not make the ship an insurer against damages, so as to exempt the cargo from a general average charge in respect to damages not arising from the deficiency. 76 Fed. 587, affirmed.

2. SAME—PORT OF REFUGE EXPENSES.
A steamship which fails to take the customary supply of coal for the voyage must be presumed to voluntarily assume the risk of putting into a port of refuge to complete her supply; and she will therefore be charge-

able with the port of refuge expenses, even if, as it turns out, she would have been obliged, because of delays from adverse storms, to seek such port for a further supply, though she had started with the usual quantity. 76 Fed. 587, affirmed.

**3.** SAME—BILL OF LADING.

A provision in the bill of lading authorizing the vessel to "call at any port or ports whatever" does not enable her to escape responsibility for the expense of putting into a port of refuge, in consequence of having taken an inadequate coal supply.   76 Fed. 587, affirmed.

**4.** SAME.

A steamship bound from a Cuban port to New York had but 9½ days' supply of coal, whereas the customary supply was for 10 days.   Ordinarily, the voyage would have taken 8 days, but she encountered a hurricane, which delayed her so that she was obliged, from lack of coal, to put into Newport News, which she reached in 12 days, having consumed considerable quantities of ship's materials and cargo.   The bills of lading authorized her to call at any port or ports whatever.   *Held*, that the ship must bear, as particular average, the expense of putting into Newport News, and also the loss of ship's materials and cargo during the time the coal she ought to have taken would have lasted, but that the remainder of the loss was a general average charge.   76 Fed. 587, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

Convers & Kirlin, for libelants.

Edmund L. Bayliss and Walter F. Taylor, for respondents.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM.   The steamship Dunedin, upon her voyage from Cienfuegos, Cuba, to New York, in October, 1891, encountered very severe weather, and was compelled to put into Newport News for coal.   Before she reached that port, she had burned some of her materials and some of her cargo for fuel.   The libel was brought before the district court for the Southern district of New York upon a general average bond to recover the respondents' share of a general average assessment made upon the steamship and her cargo for the expenses thus thrown upon each, and for the port of refuge expenses. The bill of lading of the respondents' sugar contained a clause authorizing the vessel to call at any port or ports for any purpose.

The facts in regard to the voyage and the seaworthiness of the vessel are accurately stated by the district judge, as follows (76 Fed. 587):

"The steamer left Cuba on the 3d of October, with a cargo of merchandise, including sugar of the respondents and others. An ordinary passage with her cargo, and in the probable condition of her bottom (not newly scraped), would have been eight days, or a few hours over, excluding any specially unfavorable weather.   Her consumption of coal was 12 tons per day; and the evidence does not warrant my finding that on leaving Cienfuegos she had over 115 tons,—a supply for, say, 9½ days.   She was 12 days, however, in reaching Newport News, still 1 day's sail from New York.   On the 4th of October (the second day out), on rounding St. Antonio, she met head winds and seas, and on the 9th and 10th a northeast gale.   This, on the 11th, became a hurricane, which continued through the 12th and 13th, and carried her back on her course, so that she was unable to reach Newport News until the 15th of October.   On the morning of the 11th, with only 18 tons of coal left, the engineer began to use ashes and ship's material along with the coal, and on the 12th, with but 12 tons of coal remaining, the use of sugar as fuel, along with coal, began.   During the last half day, on the 15th, before reaching

81 F.—14

Newport News, only sugar fuel, according to the captain's testimony, was used."

We agree with the district judge in his further finding that 115 tons of coal was not a reasonable supply for the voyage, at that season of the year, from Cienfuegos to New York, but that 10 days' supply, or 120 tons, should have been taken in order to comply with the demands of reasonable prudence. The assessment which had been made charged the cargo with the value of all the ship's material and sugar which had been used as fuel, and with the port of refuge expenses. The respondents' share amounted to $473.01. The ship was 12 days in reaching Newport News, with 9½ days' supply of coal, when she should have had 10 days' supply. The district judge refused to allow the expenses of going into Newport News, and charged against the ship one-fifth of the value of the burned sugar, ship's material, and oil which were consumed for fuel, and of the damage to other sugar incident to getting fuel out of the hold during the hurricane. He was of opinion that this one-fifth represented the damage resulting from her failure to take in 10 days' supply, and that "the residue, equivalent to 2 days' consumption of fuel, with the incidental damage to other bags, remains a proper subject of general average," excluding, however, the expenses of putting into Newport News. A restatement of the general average upon these principles made the amount of $369.86 due, as principal, to the libelants from the respondents. From the decree of the district court for the payment of that sum, interest and costs, each party appealed, and each was dissatisfied with the district judge's conclusions of fact. But, if those conclusions were correct, the libelants were of opinion that the expenses incident to putting into Newport News, as well as the value of all the consumed materials and cargo, should be charged in general average, while the respondents urged that, inasmuch as the vessel put to sea in an unseaworthy condition, none of the expenses were chargeable, and that, if an apportionment of the loss might be proper under other circumstances, there was in this case no way of distinguishing the loss due to the perils of the sea from the loss due to unseaworthiness.

The district judge carefully discussed in his opinion (76 Fed. 587) the questions of law in the case, and, inasmuch as his reasoning is adequately and clearly stated, we shall simply announce our concurrence in his conclusions, which are repeated, in substance, as follows:

1. A mere deficiency of five tons, or even of ten tons, below the customary and probably adequate supply of coal, does not make the ship an insurer against the damages which did not arise from the short supply, "so as to exempt the cargo from a general average charge not arising from this deficiency." The vessel would ordinarily have reached New York in 8 days. She reached Newport News in 12 days, and was then 1 day's sail from New York. If she had had an adequate supply of coal, she would still have been obliged to burn materials and cargo, and to put into a port of refuge. All the consequences of her default that can properly be allowed are the charges of putting into this port, and so much of the loss of material and cargo as arose during the half day for which the supply

that she ought to have taken would have lasted, and, "if these charges are put upon her, she is made to bear the whole consequence of the neglect."

2. But it is said that the ship ought not to bear the charges of putting into port, because she would have been obliged to turn into a port in any event. She was neglectful of her duty to take the usual supply of coal, and therefore must be presumed to have voluntarily taken the risk of putting into some port in order to complete her supply, if circumstances should require it. "By her short supply at the start, having voluntarily, in effect, agreed to go into Newport News at her own expense for more coal, if it should be needed, she cannot be allowed to escape that implied agreement, and throw the cost of that item into general average."

3. The ship must make good the consumption of material and cargo for fuel, and the damage to cargo incident thereto, for such period as the deficient amount of coal would have rendered unnecessary, if it had been taken on board.

4. The bill of lading, authorizing the vessel "to call at any port or ports for whatever purpose," was not a provision to enable the vessel to escape from the natural consequences of her own neglect of duty. The customary voyage was from Cuba directly to New York. "It is not reasonable, and the clause cannot be intended to release the ship from the performance of any of her ordinary duties in preparing for the voyage, or to authorize the ship to sail voluntarily from the port of departure with a short supply of coal, and thus deliberately to create a necessity for calling at intermediate ports not mentioned in the bill of lading, and contrary to the customary course of the voyage."

The decree of the district court is affirmed, without interest, and, as neither appeal is sustained, without costs of this court.