## THE MAINE.

### ITALIAN GOVERNMENT COMMISSION v. GREEN STAR S. S. CORPORATION.

(District Court, S. D. New York. April 8, 1924.)

1. Shipping ⊜⊐125—Shipowner impliedly warrants that vessel will not deviate unless by necessity.

Shipowner, entering on contract of carriage, impliedly warrants that vessel will not deviate unless compelled to do so by necessity.

2. Shipping ⊜⊐51—Unjustified deviation displaces contract between charterer and vessel owner.

Unjustified deviation displaces contract between charterer and vessel owner.

3. Shipping ⊜⊐106—Doubt as to meaning of bill of lading must be resolved against shipowner and in favor of cargo owner.

Doubt as to meaning of bill of lading must be resolved against shipowner who drew it, and in favor of cargo owner.

4. Shipping ⊜⊐125—Necessity to justify deviation must arise at sea.

Necessity to excuse ship's deviation must arise at sea during course of voyage, and not at loading port prior to inception on voyage.

5. Shipping ⊜⊐125—Vessel, loaded at Galveston with wheat consigned to Italy, held to have wrongfully deviated to New York to replenish fuel oil supply.

Vessel, loaded at Galveston, Tex., with wheat destined for Italy, which left Galveston with insufficient fuel oil supply for transatlantic trip, *held* to have wrongfully deviated to New York for purpose of replenishing supply, notwithstanding charter party authorized vessel to call at any port or ports for coal, etc., or to land and receive goods or passenger or for any other purpose.

In Admiralty. Libel by the Italian Government Commission against the steamship Maine; the Green Star Steamship Corporation, claimant. Decree for libelant.

Loomis & Ruebush, of New York City, for libelant.

Bigham, Englar & Jones, T. Catesby Jones, and Charles F. Quantrell, all of New York City, for claimant.

GODDARD, District Judge. The libel in this case sets forth that the libelant, an agency of the Italian government, on May 29, 1920, entered into a charter party with the Green Star Steamship Corporation, owner of the steamship Maine, whereby it was agreed as follows: That the Maine should load at Galveston, Tex., a complete and full cargo of wheat to be furnished by the Italian government, and then should proceed to a port on the West Coast of Italy; that on the 26th day of June, 1920, the Wheat Export Company, Inc., shipped on board the Maine, then lying at Galveston, and bound for Gibraltar, a full cargo of wheat consisting of 301,000 bushels, freight to be prepaid, at $24 per long ton; that on June 1, 1920, bills of lading were indorsed by the Wheat Export Company, Inc., to the libelant; that on June 26, 1920, the Maine sailed from Galveston for a safe port on the West Coast of Italy, and that the Maine wrongfully and contrary to and in violation

of the provisions of the charter party, deviated from her voyage and proceeded to the port of New York, where she arrived on or before July 4, 1920, where she was delayed for a long period; that "the delay thus following such deviation has caused severe damage to the libelant. After arriving in the port of New York, and on or about July 4, 1920, the said vessel was in collision with another vessel, viz. the American steamship Corona, as a result of which great damage was suffered by the libelant's said cargo"; that "the damage resulting to the libelants from the said collision and from the said delay amounts, as nearly as the same can now be estimated, to $100,000." A claim was filed to the Maine by the Green Star Steamship Corporation, and a stipulation for value was filed for the sum of $100,000; this stipulation was signed by the Green Star Steamship Corporation and the Maryland Casualty Company, and is in the usual form of an admiralty stipulation.

An answer was filed by the Green Star Steamship Corporation as owner of the vessel, and admitting that it entered into a contract of charter party with the Italian Government Commission, and that, between the 23d and 26th days of June, 1920, 301,000 bushels of wheat were placed on board the steamship Maine, then lying at the port of Galveston; that bills of lading, in the form used by the regular steamers plying from Galveston, were issued for said wheat; that the freight was prepaid. It admits that on the 26th day of June, 1920, the Maine sailed from Galveston bound for Gilbraltar, but put into the port of New York on July 4th, for the purpose of getting fuel oil, and, while the Maine was in New York, she was run into by the steamer Corona, as a result of which the Maine sustained serious damage, which caused her to remain in the port of New York for a long period of time repairing.

Claimant set up a separate defense, stating that the owners used due diligence for making the Maine seaworthy before she sailed from the port of Galveston, and that she was in fact seaworthy when she sailed, and that, if the libelant sustained any damage, such damage was due to the fault of those in charge of the steamship Maine and in respect of her navigation. Claimant also set up the following terms of the charter party:

"That the carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the peril of the seas or other waters, * * * by collision, stranding, or other accidents of navigation of whatsoever kind, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the shipowner, not resulting, however, in any case from want of due diligence by the owners of the ship or any of them, or by the ship's husband or manager.

"It is also mutually agreed that this contract shall be completed by the signing of bills of lading on the same form as in use by regular steamers from loading port to port of destination; or, if port of destination be one to which there is no regular line steamers from loading port, this contract shall be completed by the signing of bills of lading in the form customary for such voyages for grain cargo, which bills of lading shall, however, contain the following clauses."

That the bills of lading contained the following clauses:

"It is also mutually agreed that the ship shall have liberty to sail without pilots, to tow and assist vessels in distress, to deviate for the purpose of saving life or property; that the carrier shall have liberty to convey goods in lighters to and from the ship at the risk of the owners of the goods, to call at any port or ports in any order, to land and receive goods, coal, passengers, or for any other purpose. * * *"

The principal questions to be determined are: Whether there was a deviation, and, if so, was there an unjustified deviation?

[1] The claimant has established no general usage or custom for steamers bound from Galveston to the Mediterranean to call at New York. On the contrary, it appears from evidence that such was not the custom. The shipowner, in entering upon a contract of carriage, impliedly warrants, among other things, that his vessel will not deviate unless compelled to do so by necessity. The Sarnia (C. C. A.) 278 F. 459, 463; The Ile de Sumatra (D. C.) 286 F. 437, 438, 1923 A. M. C. 33; Constable v. National Steamship Co., 154 U. S. 51, 66, 14 S. Ct. 1062, 38 L. Ed. 903; The Citta di Messina (D. C.) 169 F. 472, 475; Scrutton on Charter Parties (9th Ed.) 85, at 263; Carver on Carriage of Goods by Sea (6th Ed.) 393.

[2] If there was a deviation, and it was not justified, its effect is to displace the contract made between the charterer and the vessel owner. The Sarnia (C. C. A.) 278 F. 459, 463; The Ile de Sumatra (D. C.) 286 F. 437, 439, 1923 A. M. C. 33; Thorley v. Orchis Steamship Co., [1907] 1 K. B. (C. A.) 660, 669.

The contention made by the vessel owner is that the contract of affreightment gave the Maine the liberty to deviate from the customary and usual route allowed by vessels in proceeding from Galveston to the West Coast of Italy, and to call at the port of New York. The charter party contains no such provision, but the language relied on by claimant is found in clause 3 of the bills of lading:

(1) "Liberty to call at any port or ports, for coal, etc."

Further, that it is agreed:

(2) "That the ship shall have liberty * * * to deviate for the purpose of saving life or property," and

(3) "To call at any port or ports, in any order, to land and receive goods, passengers, or for any other purpose."

[3] The second paragraph is really not involved, for it could hardly be contended that the Maine deviated to New York to "save life or property." It seems obvious that it was intended to distinguish between "to call" and "to deviate," and that the shipowner, in drafting the bill of lading, intended the word "deviate" to mean a deviation of the ship out of the course, and "to call" to mean a calling at a port or ports on the customary and usual route traversed by the ship on her voyage. Where there is a doubt in the bill of lading as to its meaning it is to be construed against the shipowner who drew it and in favor of the cargo owner. The Caledonia, 157 U. S. 124, 137, 15 S. Ct. 537, 39 L. Ed. 644.

In Ardan S. S. Co. v. Theband (D. C.) 35 F. 620, the bill of lading provided that the vessel "had liberty to call at any port or ports for any purpose, to sail with or without pilots, and to tow and assist vessels in all situations," and the court held that a vessel had deviated from her route from Progresso, Mexico, to New York, by proceeding to Celestuna, 40 miles distant from Progresso, and out of her course, to tow a disabled vessel to Key West. That these clauses did not permit a deviation is also supported by the following authorities: Swift & Co. v. Furness, Withy & Co. (D. C.) 87 F. 345; Morrison & Co. v. Shaw, Savill & Albion, [1916] 2 K. B. 783.

Claimant contends that, owing to the insufficient supply of fuel oil at Galveston, it was impossible to obtain more than enough oil to take her to New York, and that after making efforts to obtain fuel oil from various oil dealers at Galveston and in the vicinity, only 75 tons or 523 barrels could be obtained, and that 5,387 barrels were necessary to take her to Italy. Accordingly, it was necessary for her to stop at New York to take on the additional fuel oil required for the trip across the ocean, where there was available for her ample supply because of a contract entered into with the Standard Oil Company of New Jersey at the end of 1919 to cover the year 1920. And further that, if there was a deviation, it was justified under the rule laid down in Kish v. Taylor (1912) App. Cas. 604; The Turret Crown (C. C. A.) 284 F. 439 (4th Circuit); The Turret Crown (2d Circuit) 297 F. 766, 1924 A. M. C. 253; The Thessaloniki (C. C. A.) 267 F. 67. However, the ships referred to in these cases left port with no present intention to deviate, and had, in good faith, intended, on setting out on their respective voyages, to perform them without deviation. Thereafter, while on the voyage, it was discovered that deviation to a port of refuge was necessary owing to the owner's failure to exercise due diligence to ascertain whether his ship was or was not seaworthy, and it was held that the deviation under such circumstances does not displace the contract of affreightment, but renders the ship liable for any damages directly traceable to the deviation. It would have been contrary to public policy in such instances, the courts held, to allow the deviation to displace the contract, for it would be tantamount to "telling the master that, where trouble arose at sea and he needed to seek a port of refuge, he must endanger life and/or property to the last degree of peril of displacing his employer's contract, a choice that only too often might lead to disaster." In neither Kish v. Taylor nor the Turret Crown, supra, was the ship's actual unseaworthiness known to those in charge of her at the time of the sailing, nor was the master on sailing then possessed of the intention to deviate to some other port in order to render the vessel seaworthy by procuring there the deficient supplies or equipment.

In The Ethel, 8 Fed. Cas. 798, No. 4,540, the Ethel was chartered for a voyage from Caldera, Chile, to New York. She was to take on a part of her cargo at Junin, still farther south than Caldera, on the Chilean coast. When she left Caldera with a portion of her cargo, she sailed with only 9 members of her crew aboard, instead of 12, her usual number, and, while 9 were enough to take her down the coast, they were not sufficient to take her around the Horn. She could not, in fact, procure any sailors at Caldera to make up the deficiency, but, in-

stead of having others shipped in from Valparaiso, still farther south than Junin, on the Chilean coast, she proceeded to Junin. There 2 others of the crew deserted, leaving only 7. She determined then to stop at Valparaiso on her way down the coast, and take on at that port the additional men required. She did so, and thereafter sailed for New York. She was caught, however, in heavy weather, and had to jettison a large part of her cargo. Later, upon her arrival in New York, the charterer libeled her for the value of the cargo jettisoned, on the ground that she had deviated in going into Valparaiso to fill up her crew. Judge Benedict granted the libelant a decree, holding the Ethel had deviated; that she should not have left Caldera until she had completed her crew; that in doing so she violated her contract; that she left in a then known unseaworthy condition; that it was her duty not to have left Caldera at the beginning of her voyage until she had a crew sufficient to take her around New York and the Horn. It was not enough that she then had aboard a crew sufficient to take her to Valparaiso. He found that it was in fact impossible to procure more sailors in Caldera, but he held that the shipowner should have had them shipped to that point from Valparaiso instead of deviating the Ethel to Valparaiso for them. Judge Benedict pointed out that the owner of the Ethel contracted to have his ship fully manned, supplied, and equipped for the voyage at the loading port, and that he took the risk of getting the necessary men, supplies, and equipment at that port. He could not thereafter transfer that risk to the· charterer without the charterer's consent; and to go off the usual course to another port to get them there was tantamount to his transferring the risk to the charterer's shoulders.

The Circuit Court of Appeals for this Circuit, in Hurlbut v. Turnure, 81 F. 208, 26· C. C. A. 335, has distinctly announced a duty of a vessel never to leave her loading port without sufficient bunkers on board, even although she has liberty to halt for bunkers at some intermediate port. There the steamship Dunedin had left Cienfuegos, Cuba, for New York, with an insufficient coal supply. She called at Newport News on the way up. The court, holding the ship for the consequent charges, said:

"The bill of lading, authorizing the vessel 'to call at any port or ports for whatever purpose,' was not a provision to enable the vessel to escape from the natural consequences of her own neglect of duty.

The customary voyage was from Cuba directly to New York. 'It is not reasonable, and the clause cannot be intended to release the ship from the performance of any of her ordinary duties in preparing for the voyage, or to authorize the ship to sail voluntarily from the port of departure with a short supply of coal, and thus deliberately to create a necessity for calling at intermediate ports not mentioned in the bill of lading, and contrary to the customary course of the voyage.'"

[4, 5] A necessity might excuse a vessel's deviation, but that necessity must be a necessity arising at sea during the course of the voyage, not a necessity occurring at the loading port prior to the inception of the voyage. It seems clear to me, from the authorities, that, even if the claimant had shown it to be impossible to procure the requisite amount of fuel oil at Galveston to take the ship across the ocean, that fact would not have justified the Maine, without the charterer's consent, in deviating to some other port off the course in order to fit out there for the voyage. Her duty was to fit out and make herself seaworthy in all respects before leaving her loading port.

There has been much testimony as to whether it was reasonably possible to obtain sufficient fuel oil at Galveston or the vicinity to take the ship to Italy. There undoubtedly was a scarcity of fuel oil due to the conditions after the World War. On all the evidence, and especially upon the testimony of the representatives of the various large oil companies, I come to the conclusion that a supply of oil sufficient to take the Maine from Galveston to Italy could have been obtained at Galveston, if energetic efforts had been made by the claimant during the interval of about a month between the making of the charter party and the sailing of the Maine from Galveston, and assuming the willingness to pay the then market price for it. However, the claimant may not have been overanxious to buy at Galveston the oil for the trip across the ocean, because it had a contract with the Standard Oil Company of New Jersey, made some months previous, viz. at the end of the year 1919 to cover the year 1920, under which the claimant could obtain the required supply of fuel oil at a saving of about $35,000.

The Maine required about 5,000 barrels of fuel oil to carry her from Galveston to Italy; she actually used 5,387 barrels in the voyage from Galveston to Italy, including the alleged deviation to New York. 'When

she arrived at Galveston, she had on board 2,141 barrels, so she actually required about 3,000 barrels more. Upon her arrival at New York, according to her log, she took on 16,048.89 barrels of fuel oil.

Accordingly, a decree may be entered in favor of the libelant, Italian Government Commission, and against the claimant, with a reference to a Commissioner to ascertain the damages.