## THE RICHMOND.

## THE FLORENCE AND LILLIAN.

(District Court, D. Delaware. November 17, 1924.)

Nos. 976, 977, 985, 988.

**1. Admiralty ⊙━70—Answer in defense of cargo alone confers no right to controvert claims against ship.**

Answer made in defense of cargo alone confers no right to controvert claims against ship.

**2. Admiralty ⊙━50—Filing of intervening petition by claimant of cargo held to place intervener in position of independent libelant.**

Where intervening petition, by claimant of cargo, did not deny validity or amount of claims of other libelants, but merely sought to establish liability of vessel for damage to cargo, petitioner was in position of libelant in independent suit.

**3. Admiralty ⊙━59—Pleadings similar to those of equity.**

Though courts of admiralty are liberal in treatment of pleadings, underlying principles respecting pleading and its purposes in admiralty do not differ from those in equity.

**4. Admiralty ⊙━90—Legal effect of contumacy and default under new admiralty rule same as under old rule.**

Legal effect of contumacy and default under new admiralty rule No. 28 (Comp. St. Ann. Supp. 1923, p. 560) is same as under old admiralty rule No. 29 (Comp. St. 1916, p. 2699), in view of new rule No. 39 (Comp. St. Ann. Supp. 1923, p. 562).

**5. Admiralty ⊙━90—Effect of decree pro confesso respecting libelant's right to recover stated.**

Under new admiralty rule No. 28 (Comp. St. Ann. Supp. 1923, p. 560), effect of decree pro confesso on libels against vessel and cargo is to make direct allegations relating to libelant's right to recover stand as true for all purposes except as shown to be untrue by libel itself, and certainty lacking in matters affecting right to recover may be afforded by proofs.

**6. Admiralty ⊙━90—On default, decree may be entered for liquidated demand without proof, but, if demand not liquidated, proof must be made.**

Where amount demanded by libelant is liquidated, decree may be entered for such amount on default without proof, but, if matter sounds in damages, or is in its nature uncertain, amount due must be ascertained by proof taken ex parte.

**7. Maritime liens ⊙━64—Libel held sufficient to establish maritime lien against vessel for supplies.**

Libel alleging that libelant, at request of master, owner, or agent furnished groceries and supplies for certain price which was fair and reasonable and wholly unpaid, held sufficient to establish maritime lien on vessel, in view of Act June 5, 1920, § 30. subsec. P (Comp. St. Ann. Supp. 1923, § 8146¼ooo).

**8. Admiralty ⊙━90—Claim for supplies held unliquidated requiring proof of reasonable value.**

Where libelant on default was entitled to maritime lien for groceries and supplies furnished vessel at price which was not fixed by agreement, libelant was entitled to recover only reasonable value of goods, to be ascertained by proof.

**9. Admiralty ⊙━90—Claim for towage for specified sum liquidated, and decree pro confesso established libelant's right thereto.**

Claim for compensation under agreement to tow vessel to port for specified sum was liquidated, and decree pro confesso established libelant's right to maritime lien for agreed amount.

**10. Admiralty ⊙━90—Libelant held entitled to lien for repairs and for advances for wages of crew.**

Under decree pro confesso libelant held entitled to maritime lien for repairs to vessel, amount thereof being unliquidated to be established by proof, and for money advanced for wages of crew for liquidated amount.

**11. Admiralty ⊙━90—Claim for money advanced for expenses of vessel held too indefinite, unless supplemented by proof.**

Claim of libel for specified sum advanced to master for expenses in connection with vessel held too indefinite to establish maritime lien under decree pro confesso, unless supplemented by proof showing application of money.

**12. Maritime liens ⊙━33—Libelant held entitled to lien for agreed sum for services in discharging cargo notwithstanding cargo was short of estimated quantity.**

Where libelant agreed to discharge cargo of lumber for agreed sum, he was entitled to maritime lien against vessel for sum agreed, notwithstanding quantity of lumber was several thousand feet short of estimated quantity.

**13. Maritime liens ⊙━64—Allegation of libel held indefinite as failing to state whether libelant advanced money to master or paid bills.**

Allegation of libel that libelant at master's request advanced money necessary to pay for repairs to vessel, services, and supplies, held indefinite as failing to state whether libelant advanced money to master or paid bills.

**14. Maritime liens ⊙━65—Libelant's statement held insufficient to overcome presumption that services, etc., were furnished on vessel's credit.**

Mere fact that libelant stated to master of vessel that he would stand good for services, repairs, and supplies, held insufficient to overcome presumption that they were furnished on credit of vessel.

**15. Subrogation ⊙━23(7)—Libelant, agreeing to stand good for services, repairs, and supplies, held entitled by subrogation to benefit of liens of persons whose claims he paid.**

Libelant, who, at master's request, agreed to stand good for services, repairs, and supplies furnished vessel, was not volunteer, but was entitled by subrogation to benefit of liens of persons whose claims he paid.

**16. Maritime liens ⊙━9—Item covering charges for towage, guaranteeing, and paying bills, etc., allowed against vessel.**

On libel of vessel, item covering charges for towing vessel to safe anchorage, notifying owners of vessel and underwriters of cargo of vessel's condition, guaranteeing and paying bills, etc., was allowed against vessel.

**17. Shipping ⊙━201—Shipowner only person who can exercise lien on cargo for general average contributions.**

Shipowner has lien on goods for general average contributions due in respect of goods, but he is only person who can exercise such lien.

**18. Shipping ⊕189—Shipowner cannot recover general average contributions for loss due to unseaworthiness of vessel.**

Shipowner cannot recover general average contributions for loss directly attributable to unseaworthiness of vessel.

**19. Shipping ⊕65—Hypothecation of cargo without communicating with owner of cargo, where feasible, held invalid.**

Where master of vessel could easily have communicated with owner of cargo, but failed to do so, his contract hypothecating cargo was invalid.

**20. Shipping ⊕133—Cargo owner held entitled to lien for damages to cargo.**

Where cargo of lumber was damaged because of vessel's unseaworthiness, and was discharged before reaching destination to permit necessary repairs to vessel, which was seized and sold, requiring sale of cargo at loss, cargo owner was entitled to maritime lien against vessel for loss sustained.

In Admiralty. Separate libels by Samuel C. Loveland, owner of the tug Richmond, by the American Car & Foundry Company, by Philip P. Manta and others, trading as Manta, Souza & Co., and by David W. Burbage, trading as D. W. Burbage & Co., against the American schooner Florence and Lillian and her cargo of 301,000 feet of white pine lumber. Decree for libelants.

Otto Wolff, Jr., of Philadelphia, Pa., for libelants.

J. Thurston Manning, Jr., of Philadelphia, Pa., for Skillings Whitneys & Barnes Lumber Co., Inc., claimant of cargo.

MORRIS, District Judge. Having obtained supplies from Manta Souza & Company the schooner Florence and Lillian, laden with lumber, sailed on September 8, 1920, from Boston for Havana. On the course of the voyage she became waterlogged, and put into Chincoteague, Va., in distress. There her master, Captain Barter, advised by telephone D. W. Burbage of Lewes, Del., that the vessel could not proceed, and asked for aid. Service and supplies were thereafter obtained at Chincoteague, for which payment was made by Burbage. The schooner was then towed by the tug Richmond to Wilmington for repairs. The American Car & Foundry Company there discharged the cargo, made further repairs to the vessel, and advanced money to the master for supplies and for the crew's wages. Between November 4 and November 27 libels in rem were filed against the schooner and her cargo by S. C. Loveland, owner of the tug Richmond, American Car & Foundry Company, D. W. Burbage, and, against the schooner alone, by Manta Souza & Co., to recover the amount of their respective claims. Attachment was made by the marshal as prayed. On the petition of Loveland the vessel was sold on November 27. The sale was confirmed and the proceeds of sale paid into the registry of the court. In each of the first three causes Skillings Whitneys & Barnes Lumber Company, Inc., intervened in December, 1920, and made claim to the cargo. Bond was given and the cargo released. On October 31, 1921, the claimant of the cargo filed in each of the three causes an answer denying liability of the cargo. Upon the same day the Skillings Company, by petition of intervention, filed in the cause instituted by Loveland, asserted that a part of the cargo had been lost at sea and the remainder damaged; that the vessel was liable therefor; and prayed a decree against the proceeds of sale to the amount of its damages. No claimant of the schooner having made answer to the libels, it was adjudged on January 29, 1923, that the libels be taken pro confesso against the schooner. The amount of the claims as alleged exceeds the proceeds of sale. The cases were consolidated, but for purpose of trial only. Final hearing has been had in open court.

[1-3] The Skillings Company, asserting that each person claiming in admiralty a right to share in an inadequate fund may dispute, without pleading its defenses, the validity, the amount, and the rank of every other claim, attempts not only to support its own claim but by evidence alone to challenge the validity, the amount, and the rank of the other claims. The libelants contend that their right to liens against the schooner and, in turn, against the proceeds of sale was fixed and established by the decrees pro confesso against the ship, and that, consequently, the Skillings Company is without right, either as claimant of the cargo or as a petitioner intervening in the Loveland cause for the purpose of asserting a claim against the fund, to question the validity or the amount of the claim of any libelant. It is, of course, obvious that answers made in defense of the cargo alone by a claimant of the cargo confer no right to controvert claims made against the ship. Consequently, it is equally obvious that, if the Skillings Company is in a position to dispute the claims of the libelants as against the ship, it has that right only by reason of its intervening petition filed in the Loveland cause for the sole purpose of asserting its own claim against the fund. That petition is not at all in the nature of an answer to the Loveland or other libel; and does not deny the validity or amount of the claim of any libelant. Even if an intervening peti-

tioner may in and by his intervening petition contest the claim of the libelant (see The Two Marys [D. C.] 12 F. 152; The Clara A. M'Intyre [D. C.] 94 F. 552, 555), this one does not attempt to do so. As the purpose of that petition was to establish a liability of the proceeds of sale because, as it is alleged, the boat was liable, it would seem clear that the petitioner gained nothing by its delay in making its claim until after the schooner had been sold, and that its claim against the proceeds stands in no better position than it would have stood had it been made by libel and attachment against the boat before sale. The filing of the petition placed the intervener virtually in the position of a libelant in an independent suit. See Conkling on Admiralty (2d Ed.) vol. 2, p. 540. Consequently, the question here presented, as I see it, is, May a libellant be heard to attack at final hearing either the validity or the amount of claims set up in other libels which have been adjudged to be taken pro confesso for want of an answer? Mr. Story, in his Commentaries on Equity Pleading, § 1, says:

"It is obvious, that, in every system of jurisprudence, professing to provide for the due administration of public justice, some forms of proceeding must be established to bring the matters in controversy between the parties, who are interested therein, before the tribunal, by which they are to be adjudicated. And for the sake of the despatch of business, as well as for its due arrangement with reference to the rights and convenience of all the suitors, many regulations must be adopted to induce certainty, order, accuracy, and uniformity in these proceedings. Hence it will be found that the jurisprudence of every civilized country, ancient and modern, has established certain modes, in which the complaints and defenses of parties are to be brought before the public tribunals; and has authorized the latter, by rules and orders, to prescribe the time, the manner, and the circumstances in which every suit is to proceed from its first institution to its final determination."

Though courts of admiralty are liberal in their treatment of pleadings, the underlying principles with respect to pleading, and its purpose, in admiralty do not differ from those laid down by Mr. Story. See McKinlay et al. v. Morrish et al., 62 U. S. 343, 16 L. Ed. 100; Benedict's Admiralty, § 303. These principles are carried into effect by the rules in admiralty. When the suits at bar were instituted, the twenty-ninth rule provided in part (Comp. St. 1916, p. 2699):

"If the defendant shall omit or refuse to make due answer to the libel upon the return day of the process, or other day assigned by the court, the court shall pronounce him to be in contumacy and default; and thereupon the libel shall be adjudged to be taken pro confesso against him, and the court shall proceed to hear the cause ex parte, and adjudge therein as to law and justice shall appertain." No case is cited in which the effect of a decree pro confesso under this rule upon a person standing in the position of the Skillings Company has been considered. But the eighteenth equity rule adopted in 1842 was not unlike the twenty-ninth admiralty rule promulgated under the act of 1842. It provided that "in default thereof [plea, demurrer or answer] the plaintiff may, at his election, enter an order (as of course) in the order book, that the bill be taken pro confesso; and thereupon the cause shall be proceeded in ex parte, and the matter of the bill may be decreed by the court * * * if the same can be done without an answer, and is proper to be decreed." The effect of a decree pro confesso had under that rule was considered by the Supreme Court in Thomson v. Wooster, 114 U. S. 104, at page 111, 5 S. Ct. 788, 791 (29 L. Ed. 105), Mr. Justice Bradley said:

"A carefully prepared history of the practice and effect of taking bills pro confesso is given in Williams v. Corwin, Hopkins Ch. 471, by Hoffman, master, in a report made to Chancellor Sanford, of New York, in which the conclusion come to (and adopted by the Chancellor), as to the effect of taking a bill pro confesso, was that 'when the allegations of a bill are distinct and positive, and the bill is taken as confessed, such allegations are taken as true without proofs,' and a decree will be made accordingly; but 'where the allegations of a bill are indefinite, or the demand of the complainant is in its nature uncertain, the certainty requisite to a proper decree must be afforded by proofs. The bill, when confessed by the default of the defendant, is taken to be true in all matters alleged with sufficient certainty; but in respect to matters not alleged with due certainty, or subjects which from their nature and the course of the court require an examination of details, the obligation to furnish proofs rests on the complainant.'

"We may properly say, therefore, that to take a bill pro confesso is to order it to stand as if its statements were confessed to be true; and that a decree pro confesso is a decree based on such statements, assumed to be true, 1 Smith's Ch. Pract. 153, and

such a decree is as binding and conclusive as any decree rendered in the most solemn manner. 'It cannot be impeached collaterally, but only upon a bill of review, or [a bill] to set it aside for fraud.'"

And at page 114 (5 S. Ct. 793):

"* * * From the authorities cited, and the express language of our own rules in equity, it seems clear that the defendants, after the entry of the decree pro confesso, and whilst it stood unrevoked, were absolutely barred and precluded from alleging anything in derogation of, or in opposition to, the said decree, and that they are equally barred and precluded from questioning its correctness here on appeal, unless on the face of the bill it appears manifest that it was erroneous and improperly granted. * * *"

Central Railroad Co. v. Central Trust Co., 133 U. S. 83, 10 S. Ct. 235, 33 L. Ed. 561, is to the same effect. The status of a defendant before a master on reference under a decree pro confesso was also referred to in Thomson v. Wooster thus:

"* * * In the English practice, it is true, as it existed at the time of the adoption of our present rules (in 1842), the defendant, after a decree pro confesso and a reference for an account, was entitled to appear before the master and to have notice of, and take part in, the proceedings, provided he obtained an order of the court for that purpose, which would be granted on terms. * * *

"The old rules, adopted in 1822, did not contain this ex parte clause [found in the eighteenth rule]; they simply declared that, if the defendant failed to appear and file his answer within three months after appearance day, the plaintiff might take the bill for confessed, and that the matter thereof should be decreed accordingly; the decree to be absolute unless cause should be shown at the next term. * * * Under these rules the English practice was left to govern the subsequent course of proceeding, by which, as we have seen, the defendant might have an order to permit him to appear before the master, and be entitled to notice. Whether under the present rule a different practice was intended to be introduced is a question which it is not necessary to decide in this case." Pages 119, 120 (5 S. Ct. 796).

[4] I have been unable to find any case in which the meaning of the ex parte clause in the old eighteenth equity rule or the old twenty-ninth admiralty rule has been determined. Mr. Langdell in his Summary of Equity Pleading, § 84, says that upon the taking of the bill for an account pro confesso the plaintiff is entitled to a decree for an account; but upon the taking of the account before the master he must prove the amount due to him, although he has fully set forth in the bill what he claims to be the true state of the account. Mr. Langdell there further says that the defendant has the same right to appear before the master and contest the plaintiff's claim as if he had answered. In support of that statement King v. Bryant, 3 My. & Cr. 191, is cited. I think the purpose and meaning of the ex parte phrase in the equity and admiralty rules could not have been otherwise than to bring about a change in the practice existing prior to and at the time of their adoption. As I see no distinction, or reason for a distinction, with respect to the effect of decrees pro confesso between the old eighteenth equity rule and the old twenty-ninth rule in admiralty, it seems to me clear that, if the twenty-ninth rule in admiralty were still in effect, a claimant for the vessel would be without right to oppose either the validity or the amount of any claim set up in any libel taken pro confesso. But on March 7, 1921, the new rules of practice in admiralty went into effect, and it was not until January, 1923, that the libels herein were adjudged to be taken pro confesso. Apparently the new rules are as applicable to causes pending when they went into effect as they are to causes thereafter instituted. New rule 28 (Comp. St. Ann. Supp. 1923, p. 560) provides:

"If the respondent or claimant shall omit or refuse to make due answer to the libel upon the return day of the process, or other day assigned by the court, the court may pronounce him to be in contumacy and default, and thereupon shall proceed to hear the cause ex parte, and adjudge therein as to law and justice shall appertain. But the court may set aside the default and upon the application of the respondent or claimant admit him to make answer to the libel on such terms as the court may direct."

Even if the omission of the pro confesso clause from the new rule had for its purpose the termination of the necessity for an express adjudication after default that the libel be taken pro confesso, the rules nowhere indicate that it was the purpose of the rules to change the legal consequences or effect of a default. The term "pro confesso" seems to have fallen into disuse in the English chancery practice, but a default is now a default at law or in equity. See order XXVII (The Annual Practice 1911, p. 380), entitled "Default of Plead-

ing." It would seem that the omission of the expression "pro confesso" in the new twenty-eighth admiralty rule was but a step toward conformity with the advanced English practice and terminology. That the legal effect of contumacy and default is now the same as under the old twenty-ninth rule is, however, placed beyond doubt by the new thirty-ninth rule (Comp. St. Ann. Supp. 1923, p. 562), which provides:

"The court may, in its discretion, on motion of the respondent or claimant and the payment of costs, rescind the decree in any suit in which, on account of his contumacy and default, the matter of the libel shall have been decreed against him, and grant a rehearing thereof at any time within sixty days after the decree has been entered, the respondent or claimant submitting to such further orders and terms in the premises as the court may direct; and the term of the court shall be deemed extended for this purpose until the expiration of such period of sixty days."

[5, 6] I think the decrees made in the suits at bar that the libels be taken pro confesso against the vessel were authorized by the new admiralty rules. I think the effect of those decrees was to make the direct and positive allegations of each libel touching the libelant's right to recover stand as true for all purposes of the cause except to the extent that such statements may be shown to be untrue by other statements contained in the libel itself. I think that with respect to matters, pertaining to each libelant's right to recover, not alleged with due certainty, the certainty requisite to a proper decree in that cause may and must be afforded by proofs. I further think that, where the amount demanded is liquidated and certain, and it is so shown by the libel, a decree may be entered upon default and without proof other than the confessed allegations of the libel for such amount, but, if the matter sued for sounds in damages, or is in its nature uncertain, the amount due must be ascertained by proof, and is not fixed by the default. Thomson v. Wooster, 114 U. S. 104, 113, 5 S. Ct. 788, 29 L. Ed. 105; Benedict's Admiralty, § 380. Under the rule the taking of all proofs is done ex parte.

[7, 8] Tested by these principles, what should be the decree in the cause instituted by Manta, Souza & Co.? The libel alleges that in September, 1920, the schooner being in need of certain groceries, provisions, and ship supplies, to enable her to prosecute the voyage on which she was then engaged, the libelant, at the request and upon the order of the master, owner, or agent of the schooner, furnished and delivered on board thereof certain specified groceries, provisions, and ship supplies at and for a price of $749.79, that sum being just and reasonable and the market price therefor prevailing at the time of the delivery of the supplies, and that the sum of $749.79, with interest thereon from September 4, 1920, remains wholly due and unpaid. These allegations, which are to be taken as true, are sufficient, I think, in view of the act of June 5, 1920, § 30, subsec. P (41 Stat. 1005 [Comp. St. Ann. Supp. 1923, § 8146¼ooo]), to establish the libelants' right to a maritime lien on the vessel for the supplies furnished. No proof was produced or offered by the libelant to establish the amount of the libelants' claim; it being contended that the claim was liquidated and certain, and that consequently no proofs were needed. But I find myself not in accord with the libelant in this respect. The suit is one to recover for goods sold and delivered. There is no allegation that the price therefor was fixed by agreement of parties. The result is that the libelant may recover only the amount that the goods were reasonably worth. Hence the claim is unliquidated and may be ascertained only upon proof. See 5 C. J. p. 1411. The necessary proof has not been furnished. The libelant may, however, if it so desires and can, take such evidence at any time within 30 days from the filing of this opinion.

[9] The Loveland libel alleges that the libelant was employed by D. W. Burbage "acting for and in behalf of the said schooner, her cargo, and the underwriters concerned" to tow the schooner and her cargo from Chincoteague to Wilmington for repairs; that it was agreed that the libelant should receive the sum of $500 therefor, and that such service was fully and properly performed. These allegations, having been confessed so far as the vessel is concerned, establish the right of the libelant to a maritime lien against the vessel for the towage. As the amount of the compensation was agreed to, the claim is a liquidated one. Hence the decree pro confesso establishes, without proof, not only the right of libelant to a lien against the vessel, but the amount thereof as well. The liability of the cargo will be hereinafter considered.

[10-12] The libel of American Car & Foundry Company embraces four distinct items. One is for work done and materials furnished in making repairs to the ship at the request of the master. The allegations, confessed by the decree pro confesso, establish the libelant's right to a maritime lien

against the vessel for this item, but, as the amount due therefor was not liquidated by agreement or otherwise, it was necessary to establish the amount thereof by proof. This has been done and the amount fixed at $105.-26. The claim for this item is made against the vessel only. Another item is for the sum of $800 advanced to the master "for the wages of her crew." I think the libelant has established by confessed allegations and proof its right to a lien against the vessel for that amount. Another item is for the further sum of $25 "advanced to the said master * * * for expenses in connection with said vessel." This allegation, though confessed, is, I think, too indefinite and uncertain to establish, unless supplemented by proof, a right to a maritime lien against the vessel therefor. The evidence produced in support of this item goes no further than to show that the sum was advanced to the master upon his request and statement that he needed it for supplies. The application of the money is not shown. I think that a right to a lien for this item has not been established. The remaining item is for service in discharging the cargo at an agreed price of $1,001, arrived at by a price of $3.50 per thousand upon the estimated quantity of lumber. The fact that the quantity of lumber was a few thousand feet less than the estimated amount is without legal effect. It is alleged 'that before the repairs could be made to the vessel it was necessary to discharge her cargo. The libelant, in my opinion, is entitled to a lien against the vessel for the agreed amount. The libelant alleges and contends that for this item it is entitled to a lien against the cargo as well. This question will be hereinafter dealt with.

[13-15] The Burbage libel alleges that the libelant "is engaged in the business of acting as agent for ship and steamship brokers and vessel owners at Lewes, Del., and has been so engaged for many years past." The claim is made up of three items. With respect to the first it is alleged:

"That on or about the 8th day of September, 1920, the said schooner, having on board 301,000 feet of white pine lumber, left the port of Boston, Mass., bound for Havana, Cuba, and in the course of the voyage became water-logged and in distress, and was compelled to seek assistance to enable her to reach a harbor for the safety of vessel and cargo. Upon learning of her condition the libelant sent a fishing steamer to her assistance, by means of which the vessel was enabled to reach Chincoteague, Va., of which fact the libelant notified the owners of the vessel and the representatives of her cargo. The vessel's pumps were out of commission, and other temporary repairs were required to enable the vessel to be pumped out. This work was attended to by the libelant, and, as the master was without funds, at his special instance and request the libelant advanced the money necessary to pay for such work and for other expenses in connection with the vessel at Chincoteague amounting in the aggregate to the sum of $142.97. * * *"

[16] The allegation is indefinite, in that it does not state whether Burbage advanced the money to the master or paid the bills. The testimony discloses that Burbage told the master "to go ahead and get his supplies there, what he needed, and we would stand good for them." This was done. The bills for services, repairs, and supplies were itemized, approved by the master, and paid by Burbage. The amount paid was $129.-74. I think the mere fact that Burbage told the master that he would stand good for the services, repairs, and supplies is not sufficient to overcome the presumption that they were furnished on the credit of the vessel. The Emily Souder, 84 U. S. 666, 21 L. Ed. 683; Robins Dry Dock & Repair Co. v. Chesbrough, 216 F. 121, 132 C. C. A. 365; Olympia Shipping Corp. v. Morse Dry Dock & R. Corp. (C. C. A.) 275 F. 199. I think Burbage not a volunteer and that he is entitled by subrogation to the benefit of the liens of persons whose claims were paid by him. The second item is a charge of $250, for services rendered to the vessel by Burbage in assisting her by fishing steamer to safe anchorage at Chincoteague, notifying owners of vessel and underwriters of cargo of vessel's condition, guaranteeing and paying the bills incurred at Chincoteague, and obtaining tug to tow vessel to Wilmington and advising and assisting master in protecting underwriters' interest. This item was approved by the master. This item will be allowed as against the vessel upon the authority of the Wyandotte, 145 F. 321, 75 C. C. A. 117; The Ascutney (D. C.) 278 F. 991 (reversed upon other grounds [C. C. A.] 289 F. 802); and The Egeria (C. C. A.) 294 F. 791. The third and remaining item is a charge of $12.23 paid for telephone messages sent by Burbage in the performance of his services for the vessel. I think this item stands upon the same footing as the last item, and will be allowed for the same reason. The whole of the Burbage claim is made against the cargo as well as against the vessel.

[17-19] To what extent, if at all, do the claims of the Loveland and Burbage libels and the $1,001 item of the American Car & Foundry libel constitute maritime liens against the cargo? If any libelant has a lien against the cargo, such lien must arise, as I see it, because the claim is a salvage claim or because the cargo was rendered liable to the libelant under the law of general average or because the cargo was lawfully hypothecated by the master of the schooner. It cannot, of course, be seriously contended that the service rendered by any libelant was a salvage service or that any claim is a salvage claim. The master did not cause an average adjustment to be made. The shipowner has a lien upon the goods for general average contributions due in respect of them, but the shipowner is the only person who can exercise a lien for contributions. Carver on Carriage by Sea, §§ 442, 445. Moreover, the entire loss, as I view it, was a direct consequence of the unseaworthiness of the vessel. There is much evidence upon the question of unseaworthiness, but I think that upon no theory is it possible to say the vessel was sufficiently staunch and strong to encounter the ordinary and to be anticipated perils of the sea. For a loss directly attributable to the unseaworthiness of a vessel a shipowner cannot maintain a claim for contribution. Hurlbut v. Turnure (D. C.) 76 F. 587, affirmed 81 F. 208, 26 C. C. A. 335. Hence, if the libelants have a lien upon the cargo, it is only because the cargo was lawfully hypothecated by the master. This was not done. The owner of the cargo was at Ogdensburg, N. Y. The vessel was at Chincoteague and at Wilmington. Between either of those ports and Ogdensburg speedy communication could easily have been had. Yet the owner of the cargo was not advised that the master proposed to enter into any contract hypothecating the cargo. For want of a communication to that effect any contract of that character into which the master may have entered is invalid. The Julia Blake, Fed. Cas. No. 7578, affirmed 107 U. S. 418, 2 S. Ct. 692, 27 L. Ed. 595; Kleinwort v. The Cassa Marittima, 2 App. Cas. 156. It is true that Captain Samuels consented to the pledging of the credit of the cargo to the American Car & Foundry Company. But in my view of the evidence Captain Samuels was without power to act for the owner of the cargo and was not purporting to act for such owner. He was Lloyd's agent stationed at Philadelphia, and acted only on behalf of the underwriters. I am of the opinion that no maritime lien has been established against the cargo.

[20] Has Skillings & Co., the intervener, a maritime lien against the vessel? I think it has. Title to the cargo remained in the shipper. The damage and loss were due to the unseaworthiness of the vessel. The cargo having been discharged at Wilmington to permit the making of repairs to the vessel, and the vessel having been seized and sold, the lumber was not again placed aboard. No vessel was available by which to reship to Cuba. Owing to its having been cut to unusual measurements for special uses and its damaged condition the lumber was not readily resalable. Much of it had been lost at sea. The net amount that could be realized for what remained was $10,937.99 less than the price that was to have been obtained in Cuba for the original cargo. In addition to the direct loss as ascertained by the resale of the cargo the owner was put to a direct expense of $1,878.04 for resorting, regrading, and caring for the lumber at Wilmington. Storage charges amounted to $828.31 and insurance to $106.06 or a total damage of $13,750.40. I think the intervener has a maritime lien for this amount.

With respect to the rank of the several liens and the distribution of the fund, the libelants take the position that the fund should be distributed thus: (1) To the payment of all court costs and expenses. (2) To the payment of the claims of the American Car & Foundry Company for unloading cargo and making repairs to the vessel, with interest thereon from October 20, 1920. (3) To the payment of the Loveland claim, with interest from October 16, 1920. (4) To the payment of the sum of $800 advanced by the American Car & Foundry Company for seamen's wages, with interest from October 19, 1920. (5) To the payment of the Burbage claims, with interest from November 27, 1920. (6) To the payment of the claim of Manta Souza & Company, with interest from September 4, 1920 (if this claim be hereafter established as alleged). (7) To the payment of the Skillings & Co. claim.

The priority of the several claims as stated by the libelants is not disputed by the Skillings Company.

A decree in accordance herewith may be submitted.