## THE GLYMONT.

## UNITED STATES v. AMERICAN TRADING CO.

District Court, S. D. New York.
Feb. 17, 1932.

The U. S. Atty. (Charles E. Wythe, Sp. Asst. U. S. Atty., of New York City, of counsel), for libelant.

Bigham, Englar, Jones & Houston, of New York City (Martin Detels and Charles W. Harvey, both of New York City, of counsel), for respondent.

WOOLSEY, District Judge.

My decision in this case is that the libel must be dismissed, without costs.[1]

I. This is an action by the United States, as owner of the steamship Glymont, against the respondent, as owner of a cargo of nitrate, to recover contribution in a general average, which was cast by the San Francisco office of Messrs. Johnson & Higgins, and which arises out of the fact that the steamship Glymont ran out of fuel whilst on the second stage of a voyage from Mejillones, Chile, via Honolulu, to Yokohama, Japan, and as a consequence had to be towed in to Yokohama by the steamship West Harts, another ship belonging to the libelant. The amount claimed is $4,957.29, with interest thereon from February 28, 1923.

The answer is in effect a general denial, but in a letter written by the attorneys for the respondent under date of January 30, 1930, the scope of the issues is defined, and the issues are limited to the question of the sufficiency of fuel when the Glymont left Honolulu and whatever conditions of the vessel, including officers and crew, would be apt to affect her fuel consumption or supply. This letter defining the issues herein provided, however, that it should not be regarded as in any way shifting the burden of proof, which lay on the libelant in respect of such issues.

The questions involved herein are: (1) Whether the Glymont, when she left Honolulu, had on board sufficient fuel oil to meet the expectable contingencies of a voyage from Honolulu to Yokohama, commenced in the month of January; and (2) if she did not have such a supply of fuel oil, whether her failure to have it can properly be regarded as a default or error in management which, in spite of such deficiency, would have allowed

---

[1] This opinion originally provided for a dismissal of the libel with costs to the respondent, but, on motion of the United States, was modified so as to provide for dismissal without costs. See authorities at end of opinion.

her to recover in general average under the charter party which governs the relations between the libelant and the respondent, and which contains a general average clause in the form commonly known as the "Jason" clause. This clause reads as follows: "7. General Average shall be settled at New York according to York-Antwerp Rules of 1890, and Antwerp Rule of 1903, and as to matter not therein provided for, according to the law and usage at the port of New York. If the ship owners shall have exercised due diligence to make the vessel in all respects seaworthy and to have her properly manned, equipped and supplied, it is hereby agreed that in case of danger, damage or disaster, resulting from accident or default or error in navigation or in the management of the vessel or from any latent or other defect in the vessel, her machinery and appurtenances, or from unseaworthiness, although existing at time of shipment, or at the beginning of the voyage (provided the defect or unseaworthiness was not discoverable by the exercise of due diligence) the shippers, consignees or owners of the cargo shall nevertheless pay salvage and any special charges incurred in respect to the cargo and shall contribute with the ship owners in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred for the common benefit or to relieve the adventure from any common peril."

II. The Glymont was a single screw steel cargo vessel launched by her builders, the Albina Engine & Machine Works, of Portland, Or., in 1919.

She had an over-all length of 284 feet, registered beam of 44 feet 1 inch; her gross tonnage was 2,722, her net tonnage 1,672. She was an oil burner with two Scotch boilers and triple expansion 1,400 horse power engine. Her designed speed was 12 knots and her fuel oil tank capacity was 4,056⁹⁄₁₀ barrels, and her intended consumption was 143 barrels of fuel oil per day.

As will have been realized from the dimensions given, the Glymont was not a large vessel. She had a dead weight carrying capacity at her summer marks of 19' 1" of 3,700 tons, which meant, at a submersion of 19' 1", she could carry 3,700 tons of cargo, fuel stores, and provisions.

Having arrived at Valparaiso with a cargo of coke from Baltimore, and discharged that cargo there, the Glymont proceeded to Mejillones, Chile, where she loaded, in pursuance of the charter party with the respond-

ent referred to above, 34,521 bags of nitrate for Yokohama. It is claimed that the Glymont took on board at Valparaiso 1,328 barrels of fuel oil. When she completed her load at Mejillones, she proceeded northward, and on December 26, 1919, claims to have taken on 2,051⁵⁄₁₀ barrels of fuel oil at a place called Talara Bay.

She then sailed to Honolulu, a distance of 4,806 nautical miles, and arrived there safely on January 18, 1920. It is claimed that she loaded at Honolulu 2,647.82 barrels of fuel oil. She sailed thence for Yokohama, distant on a great circle course 3,394 miles, and by Rhumb line 3,445 miles.

On February 12, 1920, when she was about 300 miles from her destination, it was found that she only had 128 barrels of fuel oil left on board, instead of 313 as seems to have been expected. She tried to use her nitrate cargo to keep up steam, but without success, and, as the weather was stormy, asked assistance.

On February 14, the steamship West Harts, also owned by the United States, came alongside; and at 6.25 p. m. took the Glymont in tow and brought her to Yokohama, arriving there at 2.30 a. m. on February 17, 1920.

III. The fact that the Glymont's fuel gave out before she reached Yokohama casts on the libelant a heavy burden of explanation.

In the effort to meet this burden the libelant is hampered by the fact that many of the documents, which should at least be available in every maritime case for the purpose both of refreshing the recollection of witnesses and of checking their testimony, are lacking here.

The deck logs, both smooth and rough, are missing, although some extracts from them have been produced. The rough engine room log is missing. The book showing the soundings of the fuel tanks is missing. Furthermore, the original abstracts of the deck logs which were offered in evidence on a deposition of the master have also been lost.

It is perfectly obvious that in such a large office as that of the Shipping Board, especially having regard to the different concerns which had operated the Glymont from time to time, that the inability of the libelant to produce these documents does not involve an inference that the government is improperly withholding them. It has to be regarded, however, as an unfortunate circumstance which drives the trier of the facts from the

usual sources of information available in a case of this kind to an endeavor to see if he can find some constant which can act as a check on the situation and from which he can achieve with some measure of accuracy a fair estimate of the amount of fuel oil which was on board the vessel at Honolulu which is, of course, the crucial question in the case.

The average adjustment was finally cast on February 28, 1923. The libel was not filed until June 15, 1927.

The witnesses for the libelant were not examined until upwards of nine years after the event. Their memories naturally needed to be refreshed, and, as some of the best sources of such refreshment were lacking, their evidence does not convey to my mind any impression of accuracy in regard to certain important details which constitute the pivotal considerations herein.

For example, the amount of fuel oil on board the Glymont at a given place is the principal question here, and it is astonishing to be faced with the fact that the chief engineer admittedly did not keep an accurate record of the fuel oil on board. He apparently preferred the role of magician to that of tallyman, and to keep some oil "up his sleeve," to be produced when an extra supply was needed. As was quite expectable, the event showed that this source of supply was not reliable.

IV.  The constant, which, it seems to me, is the only safe control to invoke in a case where the record is as unsatisfactory as it is here, is the dead weight capacity scale of the steamship which, as it is based on the theoretics of her builders, may not be precisely accurate, but may safely be considered to be substantially correct for our present purposes.

A vessel's hull, machinery, appurtenances, and the fresh water in her boilers, together regarded as her structure, has first to be eliminated in determining what part of her total displacement constitutes her dead weight capacity, and the capacity plan furnished by her builders is arrived at by a deduction from her total displacement of the weight of her structure as above defined. This difference constitutes the safely available buoyancy of a merchant steamship for (1) the carriage of cargo and its necessary adjuncts, such as dunnage and passengers, if any, with their luggage, which may be conveniently called the commercial deadweight of the vessel, and (2) the fuel, fresh water in tanks, consumable stores and provisions,

crew and their effects, which may be conveniently called her functional deadweight; for, in order to achieve her purpose, a merchant steamship must carry cargo properly stowed, and she must also have enough fuel to meet the expectable contingencies of her voyages and a properly provisioned crew and stores for her own use.

V.  The safe and successful operation of a merchant steamship obviously depends, therefore, on how wisely her commercial and functional deadweights are balanced.

The problem in this case is a good illustration of this fact, for we have to start with an attempt to determine how much cargo the Glymont shipped as commercial deadweight in Chile in order to be able to make a proper inference from the somewhat vague and unsatisfactory data available as to the amount of fuel oil which the vessel had on board when she left Honolulu for her voyage to Yokohama.

The most accurate method on the present record for determining the commercial deadweight on the Glymont is to find what dead weight she had on board at the only time when we can fairly consider that her functional deadweight had been in effect eliminated.

VI.  That time is on her arrival at Yokohama when her fuel oil was concededly so low as not to respond to her tank suction, when she had been running her evaporator for some days because her fresh water had been used up, and when her provisions and stores were at their lowest, amounting in all to not more than a few tons.

When the Glymont reached Yokohama, her mean draft was 17 feet 11 inches, and on that draft her deadweight scale shows that she had on board 3,350 tons of deadweight, and the evidence shows that practically all of that deadweight was cargo.

Our first step towards a solution of the problem of the amount of fuel oil available when she started from Honolulu for her trip to Yokohama is thus made. We can safely say that her captain's estimate that her nitrate cargo amounted to between 3,100 and 3,200 tons is an underestimate of from 150 to 250 tons; and in this connection it must, of course, be remembered that some cargo—just how much does not appear—was burned in an unsuccessful attempt to keep up steam just before the Glymont summoned aid.

Leaving aside the tendency of all witnesses, in matters of this kind, towards self-justification, it is quite clear that a master who

had underestimated the deadweight of the cargo he had on board, even supposing such an underestimate to be quite candid, would necessarily, if he read his vessel's draft on his displacement scale, come to the conclusion that he was using more functional deadweight capacity than he actually was using, and thus tend to make a higher estimate of the amount of fuel oil on board than was justifiable.

On the argument I suggested this as a possibility, and a careful study of the record convinces me that the guess I then hazarded was correct.

For the case seems to turn principally on the amount of fuel oil which remained in the vessel's tanks when she arrived at Honolulu. I think that the difficulty which subsequently arose was due to the fact that this amount was considerably exaggerated. This error, though not excusable, is quite understandable if, as above pointed out, the captain had much underestimated the deadweight of his cargo.

VII. When the Glymont arrived at Honolulu she had a mean draft of 18 feet, which was only 1 inch more than she had at Yokohama, where, after exhausting both her available fuel oil and her fresh water, she had a draft of 17 feet 11 inches. This one inch draft meant, at that depth, that the Glymont had on board, when she arrived at Honolulu, 25.75 tons of deadweight more than she had on board when she arrived at Yokohama.

It is, therefore, safe to assume that the deadweight which the Glymont had on board when she reached Honolulu was fuel oil, and, in so assuming, the shipowner is given the benefit of every doubt. If that is so, as there are 6.77 barrels of oil to the ton, she only had then on board 174.32 barrels of fuel oil instead of the 400 barrels estimated by the chief engineer, or the 820 barrels estimated by the master.

At Honolulu the vessel, without taking any cargo off, is claimed to have replenished what we have called above her functional deadweight capacity with upwards of 100 tons of fresh water and 2,647.82 barrels of fuel oil, so that when she left Honolulu she had a mean draft of 19 feet 5 inches. This meant that she had on board, according to her dead weight scale, a total dead weight, commercial and functional, of about 3,790 tons. Her draft had, therefore, increased at Honolulu, by reason of her loading, from 18 feet to 19 feet 5 inches, which, be it noted, made her deeper in the water than her summer marks and even deeper than her Indian summer marks, and meant, at those drafts, that she had taken 430.31 tons additional of functional deadweight. This addition consisted of such fuel oil, such fresh water, and such small amount of new provisions as she may have there taken.

The captain testified that the provisions and stores bought at Honolulu were inconsiderable in amount and estimates that with what was already on board they would not have weighed more than 4 tons. He says, however, that he took on board more than 100 tons of fresh water, though he is unable to give the exact tonnage.

VIII. Now we have seen above that the Glymont, as shown by her draft, took on board 430.31 tons of deadweight at Honolulu. The 2,647.82 barrels of fuel oil for which the Glymont was billed and paid would have amounted at 6.77 barrels per ton to 391 tons and a fraction, which would have left buoyancy on her 19 foot 5 inch draft for only 39.31 tons of water. That is possibly too little and is much less than the master's estimate.

If we call the fresh water taken 100 tons and deduct 100 from 430.31 tons taken on at Honolulu, we have 330.31 tons of fuel oil which, at 6.77 barrels per ton, comes to 2,236.19 barrels. With the addition of the 174.32 barrels then on board, we have in all 2,410.51 barrels of oil on board when the Glymont sailed for Yokohama.

In dividing the extra dead weight taken on at Honolulu between fuel oil and water, I am inclined to take the fuel oil at the amount billed and paid for and say that balance was fresh water, as to the amount of which we have only the captain's statement of an indeterminate amount which he thought was at least 100 tons.

Consequently, if I say that the Glymont took on 2,647.82 barrels of fuel oil at Honolulu, and that, with the residuum from the previous leg of the voyage, she had on board 2,822.14 barrels of fuel oil when she sailed for Yokohama, I feel sure that I shall not be far from right. I so find.

The next question to consider is whether that was enough fuel oil with which to start in January on a voyage from Honolulu to Yokohama, a distance of 3,394 miles on a great circle course and 3,445 miles on a Rhumb line course, which would be the preferred course at that time of the year.

IX. Captain de Lion, who was called as an expert by the respondent, made a very favorable impression on me. He was most in-

telligent and had made a number of trips from Honolulu to Yokohama in winter.

According to Captain de Lien, the Glymont's voyage from Talara to Honolulu in the South Pacific was not a criterion by which to determine expectable conditions on a winter voyage between Honolulu and Yokohama where rough seas and a great deal of head wind were expectable and where the ocean currents would be against her much of the time. He said that a vessel which had done an average of 9 knots per hour between Talara and Honolulu should not count on better than 7 knots per hour between Honolulu and Yokohama.

The captain of the Glymont estimated his trip to Yokohama as 15 days and refused to let the engineer fill her fuel tanks, a course which was probably necessary, for she was loaded as deep as was safe with what she had.

Apparently this estimate of Captain Safstrom was based on the Glymont's daily mileage between Talara and Honolulu.

What he should have done was to call her a 7-knot ship from there on to Yokohama. That would have meant 168 miles per day and would have required just short of 21 days for the trip.

The Glymont's average daily fuel oil consumption, as the captain himself said, was 144 barrels. For a 21-day voyage the minimum requirement would have been 3,024 barrels, on the assumption that everything went well.

The crystallized experience of the maritime world has shown that for a winter voyage a vessel should always have a margin of safety of from 20 per cent. to 25 per cent. in her fuel. The Willdomino, 300 F. 5, 1924 A. M. C. 889 (C. C. A. 3); The Waalhaven, 36 F.(2d) 706, 1930 A. M. C. 27, 29, 30 (C. C. A. 2); The Caledonier, 1926 A. M. C. 1548, 1549, 1550; Hurlbut v. Turnure (D. C.) 76 F. 587, 588; Id., 81 F. 208 (C. C. A. 2). A fortiori this is, of course, a rule which is insisted on by careful shipowners for long transoceanic voyages where head winds are expectable.

To have fulfilled this requirement the Glymont should have had, in addition to this minimum necessity of 3,024 barrels, between 600 and 750 barrels more, making a total proper allotment for her fuel oil of from 3,624 to 3,774 barrels.

The capacity of her fuel tank was adequate for this extra supply, for it held 4,056.8 barrels, but there was so much deadweight already on her that her master would

not and safely could not let the fuel tanks be filled.

I am aware that the libelant's counsel claims that such figures as I have found for the fuel oil on board at Honolulu must be wrong because he has figures to show that the Glymont actually used 3,077 barrels between Honolulu and the time of her disablement.

My belief is that his figures, precise as they appear to be, are wrong.

But suppose that they are not wrong and the Glymont did have 3,077 barrels on board and used it all up before she called for aid, and that then she still had 128 barrels on board, that total would make only 3,205 barrels which is only 181 barrels more than the minimum requirement of 3024 above noted, a margin which, as this case shows, is far too slight for safety.

If it be suggested that the Glymont had not any such margin on the voyage from Talara to Honolulu, it is quite true, but on that voyage she had good luck. The 174 tons which she had on board when she arrived would have been 20 per cent. of only 870 tons and 25 per cent. of only 696 tons, and, if her own figures are to be believed, she used 3,233 barrels on that voyage.

X. I think it is clear and I hold that the libelant has not shown that due diligence was used to make the Glymont seaworthy in respect of her fuel supply when she left Honolulu for Yokohama.

The weather which the Glymont encountered between Honolulu and Yokohama was not unexpectable at that time of year in the North Pacific. It illustrated but did not cause the insufficiency of her fuel supply. The cause of that lay further back in the negligence and bad judgment of her master at Honolulu.

Therefore the shipowner may not avail itself of the Jason clause of the charter party which is predicated on the exercise of such diligence.

XI. An order may be entered separately making this opinion stand in lieu of any findings of fact or conclusions of law herein; or provisions to that effect may be included in the decree dismissing the libel which is granted to the respondent hereby.

On Motion by the United States to Amend Decision and Strike out the Provision Thereof Allowing Costs to the Respondent.

■ Motion granted on authority of United States v. Chemical Foundation, 272 U. S. 1, 20, 47 S. Ct. 1, 71 L. Ed. 131; and United

States v. Worley, 281 U. S. 339, 344, 50 S. Ct. 291, 74 L. Ed. 887. The opinion will be corrected in accordance with this ruling, so that it will provide for the dismissal of the libel without costs.

Settle order on two days' notice.

